In the Matter of a CRIMINAL INVES-
TIGATION, 7TH DISTRICT
COURT NO. CS–1.

No. 20268.

Supreme Court of Utah.

March 31, 1988.

**634**

David L. Wilkinson, Paul M. Warner,
Stanley H. Olsen, Robert N. Parrish, and

Suzanne M. Dallimore, Salt Lake City, for appellant.

Donald B. Holbrook, George W. Pratt, and Elizabeth M. Haslam, Salt Lake City, for respondents Maxfield, Stott and Colby.

Max D. Wheeler and Rodney R. Parker, Salt Lake City, for respondents Thompson, Conklin, Ziemski, Bowman, Mike Thompson & Associates, Guardex, Alarmex and Vanguard, Inc.

Stephen B. Nebeker and John A. Adams, Salt Lake City, for respondent Utah Power and Light Co.

F. Robert Reeder, Francis M. Wikstrom, and Michael L. Larsen, Salt Lake City, for respondent Emery Mining Corp.

Sumner J. Hatch, Salt Lake City, for respondent Fletcher.

ZIMMERMAN, Justice:

Utah's attorney general appeals from a final order of the Seventh Judicial District Court holding unconstitutional an act entitled Subpoena Powers for Aid of Criminal Investigation and Grants of Immunity ("Subpoena Powers Act" or "Act"). Utah Code Ann. §§ 77–22–1 to –3 (1982). The Act creates a second method for formally investigating criminal activities in addition to the already authorized state grand jury. It provides the attorney general and county attorneys with the power to subpoena witnesses, grant transactional immunity, and conduct investigations in secret, all with limited judicial supervision.

Beginning in 1983, the attorney general used the powers conferred by the Act to conduct an investigation into alleged criminal activities involving security operations at Utah Power and Light Company ("UP &

L"). The investigation led to the filing of criminal charges. The respondents in this appeal are various individuals and companies that challenged subpoenas issued to them during the investigation. The district court dismissed the criminal investigation, ruling that the Act is facially unconstitutional and was unconstitutionally applied because it fails to provide for adequate judicial review to protect against abuse of power, is too vague, and fails to protect rights of due process and privileges against self-incrimination.

We agree that the Act was unconstitutionally applied and affirm the dismissal of the UP & L investigation. However, we reverse the lower court's ruling that the Act is facially unconstitutional because we find that the Act is subject to an interpretation incorporating a number of substantive and procedural safeguards which bring the Act into constitutional compliance.

## I. The Subpoena Powers Act

The Subpoena Powers Act was passed in 1971 upon a legislative determination that there had been "a marked increase in crime and criminal activity within this state." Utah Code Ann. §§ 77–45–19 to –21 (1971). As amended and recodified in 1980, the Act's purposes are to

> grant subpoena powers in aid of criminal investigations and to provide a method of keeping information gained from investigations secret both to protect the innocent and to prevent criminal suspects from having access to information prior to prosecution and to clarify the power ... to grant immunity from prosecution to witnesses....

Utah Code Ann. § 77–22–1 (1982). The express provisions of the amended Act[1] allow

---

1. The full text of the Act as amended in 1980 follows:

> 77–22–1. It is declared, as a matter of legislative determination, that it is necessary to grant subpoena powers in aid of criminal investigations and to provide a method of keeping information gained from investigations secret both to protect the innocent and to prevent criminal suspects from having access to information prior to prosecution and to clarify the power of the attorney general and county attorneys to grant immunity from prosecution to witnesses whose testimony is

essential to the proper conduct of a criminal investigation or prosecution.

> 77–22–2. (1) In any matter involving the investigation of a crime, the existence of a crime or malfeasance in office or any criminal conspiracy or activity, the attorney general or any county attorney shall have the right, upon application and approval of the district court, for good cause shown, to conduct an investigation in which the prosecutor may subpoena witnesses, compel their attendance and testimony under oath before any certified court reporter, and require the production of

the attorney general and county attorneys (hereinafter referred to conjunctively as "state's attorneys"), upon a showing of good cause, to receive approval from a district court for carrying out a criminal investigation. Once an investigation is approved, the state's attorney may, without additional court authorization, subpoena witnesses to testify or produce other evidence, where such evidence "may be relevant to the investigation in the judgment of the attorney general or county attorney." *Id.* at § 77–22–2(1).

The only notice expressly required to be given to a subpoenaed person is of the time and place of the interrogation, that it is "in aid of criminal investigation," and that he or she has a right to counsel. *Id.* at § 77–22–2(2). There is no express provision that those served with subpoenas must be notified of any right to challenge the subpoena, of a privilege against self-incrimination, or of a right to have further information about the nature of the investigation.

The Act allows any district court, upon written application of the state's attorney, to impose secrecy orders excluding nonessential persons from "any investigative hearing or proceeding" and requiring that the interrogation of any witness be held in secret and that the record of "such proceeding be secret." *Id.* at § 77–22–2(3). The secrecy orders are to remain in effect until the court for good cause directs otherwise. Section 77–22–3 gives state's attorneys the power to grant transactional immunity to witnesses [2] and provides a con

books, papers, documents, recordings and any other items which constitute evidence or may be relevant to the investigation in the judgment of the attorney general or county attorney.

(2) The subpoena need not disclose the names of possible defendants and need only contain notification that the testimony of the witness is sought in aid of criminal investigation and state the time and place of the examination, which may be conducted anywhere within the jurisdication [sic] of the prosecutor issuing the subpoena, and inform the party served that he is entitled to be represented by counsel. Witness fees and expenses shall be paid as in a civil action.

(3) The attorney general or any county attorney may make written application to any district court and the court may order that interrogation of any witness shall be held in secret; that such proceeding be secret; and that the record of testimony be kept secret unless and until the court for good cause otherwise orders. The court may order excluded from any investigative hearing or proceeding any persons except the attorneys representing the state and members of their staffs, the court reporter and the attorney for the witness.

77–22–3. In any investigation or prosecution of a criminal case, the attorney general and any county attorney shall have the power to grant transactional immunity from prosecution to any person who is called or who is intended to be called as a witness in behalf of the state whenever the attorney general or county attorney deems that the testimony of such person is necessary to the investigation or prosecution of such a case. No prosecution shall be instituted against the person for any crime disclosed by his testimony which is privileged under this action, provided that should the person testify falsely, nothing here

in contained shall be construed to prevent prosecution for perjury.

If during the investigation or prosecution a person refuses to answer a question or produce evidence of any kind on the ground that he may be incriminated thereby, the attorney issuing the subpoena may file a request in writing with the district court in which the examination is being conducted for an order requiring that person to answer the question or produce the evidence requested. The court shall set a time for hearing and order the person to appear before the court to show cause, if any he has, why the question should not be answered or the evidence produced, and the court shall order the question answered or the evidence produced unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction. If the witness still refuses to answer or produce the evidence, he shall be guilty of contempt of court and punished accordingly. If the witness complies with the order and he would have been privileged to withhold the answer given or the evidence produced by him except for this section, that person shall not be prosecuted or subjected to penalty or forfeiture on account of any fact or act conerning [sic] which, he was ordered to answer or produce evidence except he may nevertheless be prosecuted or subjected to penalty for any perjury, false swearing or contempt committed in answering, failing to answer, or for producing or failing to produce any evidence in accordance with the order.

The powers specified in this chapter are in addition to any other powers granted to the attorney general or county attorneys.

**2.** The immunity provisions are not at issue in the present case. We addressed the power to

tempt procedure for compelling testimony from a person who refuses to comply "on the ground that he may be incriminated thereby."

## II. The UP & L Investigation

On January 26, 1983, Judge Bunnell of the Seventh Judicial District Court in Emery County, on application by the attorney general, authorized the investigation of criminal activities pursuant to the Subpoena Powers Act. The scope of the investigation was set forth in a good cause affidavit, signed by a special agent of the attorney general, that accompanied the application. The affidavit stated that on the basis of a confidential report prepared by the Utah Department of Business Regulation's Division of Public Utilities, interviews with unnamed sources, and an investigation of UP & L, the affiant had concluded that certain of UP & L's assets had been stolen. The affidavit described the stolen assets as UP & L's labor and materials. The affidavit further alleged that the theft of these assets had been accomplished by kickbacks, payoffs, bid-fixing, falsification of shipment and delivery information, personal use or sale of UP & L property, and threats.

After determining that the statutory requirement of "good cause" to conduct an investigation had been shown, the district court authorized the attorney general to begin the criminal investigation. The court further authorized the attorney general to issue subpoenas compelling the attendance and sworn testimony of witnesses and the production of books, records, and other tangible items that constitute evidence "which is or may be relevant or material" to the investigation. Finally, the district court ordered that the Act's secrecy provision should apply to the record, to the "proceedings" of the investigation, and significantly, to the good cause affidavit.

Pursuant to this grant of authority, the attorney general's staff issued numerous subpoenas during 1983 and 1984. According to the attorney general, the majority of the subpoenas were directed to banks, state agencies, and other document repositories. In addition, the attorney general directed subpoenas to each of the respondents to this appeal: UP & L, certain officers and employees of UP & L,[3] Emery Mining Corporation, which operates UP & L's coal mining properties, and individuals associated with companies, as well as the companies, that provided security services to UP & L.[4]

Each of the subpoenas stated that it was "authorized by order of the District Court" and that "[d]isobedience to this order is punishable by contempt of Court." None of the subpoenas issued described the nature or scope of the investigation, nor were any of the respondents informed as to the general subject matter of the attorney general's investigation. None of the respondents were informed that they were targets of the investigation. Some were told prior to their interrogation or production of documents that they had the right to exercise their privilege against self-incrimination. During the course of the investigation, the attorney general instructed witnesses that the secrecy provisions of the Act prohibited their speaking to anyone other than their counsel about the proceedings.

In April of 1984, the State filed criminal bribery, racketeering, and antitrust charges, as well as civil antitrust claims, against UP & L's former corporate security officer and individuals associated with the security service companies, alleging that they had unlawfully secured contracts for security services between those companies and UP & L. The criminal investigation authorized by the district court continued after these charges were brought.

The following month, UP & L and certain officers and employees of UP & L, all

grant immunity in *State v. Ward,* 571 P.2d 1343 (Utah), *cert. denied,* 435 U.S. 1005, 98 S.Ct. 1874, 56 L.Ed.2d 386 (1977).

3. Karl J. Stott, Orrin T. Colby, Jr., and Norman Maxfield.

4. Michael C. Thompson, Bruce A. Conklin, Michael Ziemski, Patricia Thompson Bowman, Mike Thompson & Associates, Guardex, Alarmex, and Vanguard, Inc.

respondents here, filed motions for protective orders and motions to quash subpoenas. Respondents argued that the Subpoena Powers Act is unconstitutional on its face and as applied. They maintained that the Act is vague, permits unreasonable searches, and violates witnesses' privileges against self-incrimination because it does not provide for adequate disclosure to subpoenaed witnesses concerning whether they are targets of the investigation and the nature of the matter being investigated. They further claimed that the attorney general was misusing his authority to conduct a criminal investigation by issuing subpoenas under the Act for purposes actually related to civil discovery.

At a May 30, 1984, hearing on these motions, the district court denied the motion to quash. The court ruled that the Act would be presumed constitutional provided that the prosecutors (i) inform subpoenaed witnesses whether they were targets of the investigation, (ii) inform targets of the nature and scope of the matter under investigation, and (iii) conduct the investigation within the parameters of the good cause affidavit. Finally, the district court instructed the state's attorneys not to use the information obtained under the Act for purposes of civil discovery.

In June, the criminally and civilly charged respondents moved to quash subpoenas directed to them, arguing that the subpoenas were overly broad and that it was improper to issue them once formal charges had been filed. Other respondents moved the district court to, *inter alia,* reconsider its May 30th ruling upholding the Act's constitutionality. They contended that the district court's imposition of procedural safeguards as a condition to the Act's continued use constituted an impermissible judicial rewriting of the statute. Moreover, they argued that newly discovered legislative history showed that the district

court's interpretation of the Act's procedural requirements did not accurately reflect the underlying legislative intent. In response to these motions, the attorney general withdrew all outstanding subpoenas except one directed to Emery Mining.

In August, Emery Mining moved to quash that subpoena. The district court granted Emery Mining's motion to quash and agreed to reconsider the Act's constitutionality. On September 20, 1984, the court held that the Act was unconstitutional on its face and as applied. Reasoning that the Act is vague, that it violates witnesses' rights to due process and to exercise their privileges against self-incrimination, and that it fails to provide for adequate judicial supervision of the prosecutor's subpoena powers, the court dismissed the criminal investigation.

### III. Arguments on Appeal

On appeal, the attorney general concedes that the Act was unconstitutionally applied in the UP & L investigation. However, he argues that the district court erred in holding the Act unconstitutional on its face. He claims that the Act provides sufficient checks on the subpoena powers of the attorney general and the county attorneys to protect against any tendency toward prosecutorial abuse. He argues that the Act contains sufficient procedural safeguards to protect against the denial of a witness's fundamental rights to due process and to exercise the privilege against self-incrimination and that any flaws can be repaired through judicial interpretation.

Respondents [5] disagree with the attorney general's position concerning the Act's facial constitutionality, arguing that the Act's failure to expressly provide for judicial control over the investigation permits the state's attorneys unfettered discretion. Respondents also assert that the Act lacks

---

5. Each respondent or group of respondents has submitted an appellate brief and participated in oral argument before this Court. Although each emphasizes slightly different aspects of the alleged constitutional infirmities of the Subpoena Powers Act, all respondents share the same central concerns about its meaning and application. The district court has dismissed the investigative

proceeding and has cancelled all outstanding subpoenas; thus, this opinion will have no unique effect on any of the respondents, regardless of their individual circumstances. Hence, we use the term "respondents" to refer without distinction to all respondents, and we ascribe to all of them the arguments of each.

adequate procedural protections to preserve a subpoenaed witness's constitutional rights. In particular, they argue that witnesses should be informed of the nature of the matter under investigation and warned when they are targets of the investigation. They also argue that the Act's lack of record-keeping requirements and the ill-defined secrecy provisions further obfuscate a witness's opportunity to protect him- or herself from prosecutorial abuses. Respondents additionally attack the Act on the ground that it violates equal protection concepts embodied in the uniform operation of the laws provision of the Utah Constitution, article I, section 24, because it provides potential defendants with fewer procedural protections than does the state grand jury act. Finally, respondents assert that even if this Court were to find the Act constitutionally adequate, the district court's order of dismissal should still be affirmed because the Act was applied unconstitutionally during the UP & L investigation.

## IV. Analysis

### A. *Facial Constitutionality*

It is a well-established rule that legislative enactments are endowed with a strong presumption of validity and will not be declared unconstitutional unless there is no reasonable basis upon which they can be construed as conforming to constitutional requirements. *Greaves v. State*, 528 P.2d 805, 806–07 (Utah 1974). In evaluating constitutional challenges to statutes, the Court looks to "reasonable or actual legislative purposes" rather than to "any conceivable reason for the legislation," *Malan*

*v. Lewis*, 693 P.2d 661, 671 n. 14 (Utah 1984), and will construe statutes to "effectuate the legislative intent" while avoiding interpretations that conflict with relevant constitutional mandates. *State v. Casarez*, 656 P.2d 1005, 1008 (Utah 1982); *Zamora v. Draper*, 635 P.2d 78, 80 (Utah 1981). Still, a court's "interpretation [of a challenged statute] must be based on the language used, and ... the court has no power to rewrite a statute to make it conform to an intention not expressed." *Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n*, 107 Utah 502, 505, 155 P.2d 184, 185 (Utah 1945). Moreover, a court will exercise stricter scrutiny in evaluating measures that encroach upon civil liberties than it will with respect to statutes that impact what can be characterized as only economic interests. *Allen v. Trueman*, 100 Utah 36, 57, 110 P.2d 355, 365 (Utah 1941) (Wolfe, J., concurring); *see also In re Boyer*, 636 P.2d 1085, 1088 (Utah 1981); *cf. Malan v. Lewis*, 693 P.2d at 670–73; *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 678–79 (Utah 1985).

■ In light of these precepts, we have concluded that the Subpoena Powers Act is subject to a constitutional construction.[6] As set forth in detail below, we have interpreted the Act in accordance with the requirements of several federal and state constitutional provisions which provide the basis for a sensible interpretation of the Act and allow us to give it practical effect. *See Greaves v. State*, 528 P.2d at 807.

■ We have implied into the Act a number of procedural protections. Although a

---

**6.** Although we accept the attorney general's argument that the Act can be interpreted constitutionally, we concede that we are reaching the limits of our institutional competence in doing so. As Justice Wolfe stated in his concurring opinion in *Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n*, 107 Utah 502, 517–18, 155 P.2d 184, 191 (Utah 1945):

[T]here are cases where reasonable minds may differ as to the point where interpretation stops and judicial legislation begins. In those cases where a judge may conscientiously conclude that he is exercising his function of interpretation his opinion will attempt to reach, through interpretation, that result which accords with workability, practicality,

common sense and justice. But where he does not think that reasonable minds could differ, as on the question of whether what we are asked to do is really legislation, it is his duty to stay within the province of the judiciary and restrain from invading the province of the legislature despite his personal longings for a different result.

Although the judiciary is capable of engaging in the type of reconstructive surgery we perform today, we recognize that the legislature should have incorporated many of the protections we imply into the statute. It could have done so at least as effectively as, and certainly more efficiently than, the judicial branch.

court cannot supply substantive terms that are absent from a statute, *Kennecott Copper Corp. v. Anderson,* 30 Utah 2d 102, 105, 514 P.2d 217, 219 (1973), it not only may, but must supply omitted procedural elements that are necessary to implement legislation consistent with constitutional requirements. *See Carlson v. Bos,* 740 P.2d 1269, 1276 (Utah 1987); *In re Boyer,* 636 P.2d 1085, 1088 (Utah 1981); *Farris v. Cannon,* 649 P.2d 529, 531 (Okla.1982); *see also State v. Ruggeri,* 19 Utah 2d 216, 222–25, 429 P.2d 969, 972–75 (1967); *Baine v. Beckstead,* 10 Utah 2d 4, 347 P.2d 554 (1959); *cf. State in re Clatterbuck,* 700 P.2d 1076, 1081 (Utah 1985) (supervisory authority over judicial procedures).

## 1. Judicial Supervision

■ The present version of the Subpoena Powers Act expressly requires, as respondents note, rather minimal supervision of an investigation. The Act provides only that the district court may authorize a criminal investigation upon a good cause showing, invoke the secrecy provisions, if requested, and limit those who may attend the proceedings. Utah Code Ann. § 77–22–2 (1982). Before the Act was amended in 1980, however, the district court had greater supervisory powers. Under the 1971 Act, the court did not authorize an entire investigation and then step away; instead, "upon application ... and for good cause shown," it authorized the prosecutor to issue a particular subpoena. Utah Code Ann. § 77–45–20 (1971). Thus, under the prior Act, the district court engaged in preissuance approval of each subpoena, which would have provided it with an opportunity to judge the subpoena's relevance to the investigation without requiring a motion to quash. The 1971 Act also provided, with respect to secrecy, that the

interrogation of a witness could be performed before a "closed court." *Id.* In the 1980 amendment, the reference to interrogation before a court was deleted and replaced with a provision that interrogations could be held "in secret." These amendments were enacted without debate as part of a general recodification of the Utah Code of Criminal Procedure. To the extent that any legislative intent can be gleaned from the amended Act itself, we agree with respondents that the legislature did aim to limit judicial involvement in the criminal investigation. However, we think that those limitations are within constitutional bounds.

Respondents argue generally that the Act's failure to mandate more judicial supervision and control over the investigation violates the federal fourth amendment prohibition against unreasonable searches and seizures[7] and our state constitution's separation of powers provision, article V, section 1. With respect to their fourth amendment claim, respondents assert that the Act provides witnesses with no effective means of obtaining precompliance judicial review of subpoenas. As a result, prosecutors will have unfettered discretion to subpoena anyone or anything they wish. Such discretion permits the state's attorneys to unreasonably compel testimony and evidence, thereby violating privacy interests protected by the fourth amendment. Respondents also contend that conferring this unrestricted discretion on the state's attorneys violates the separation of powers doctrine by vesting judicial subpoena powers in the hands of an executive branch officer.

The attorney general argues that adequate judicial supervision exists because the court has power to limit the scope of the investigation and, despite the lack of an express provision in the Act, also has au-

7. Respondents do not support the search and seizure argument, however, with reference to the relevant Utah constitutional provision, article I, section 14. Several of respondents' other arguments are based solely on references to federal constitutional provisions without reference to analogous state constitutional provisions. Consequently, in resolving such issues, we do not address the requirements of the state constitution. *See State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988); *State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986).

Where state constitutional issues have been raised, we have so noted and have indicated that certain of our specific holdings are based on state constitutional grounds independent of federal constitutional provisions, in accord with *Michigan v. Long,* 463 U.S. 1032, 1040–42, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983).

thority to review the reasonableness of subpoenas challenged by way of motions to quash.

■ The fourth amendment prohibition against unreasonable searches and seizures protects both individuals, *see, e.g., Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967), and corporations, *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 205–06, 66 S.Ct. 494, 503–504, 90 L.Ed. 614 (1946), against arbitrary government intrusion through the exercise of subpoena powers. *See v. City of Seattle*, 387 U.S. 541, 544, 87 S.Ct. 1737, 1739–40, 18 L.Ed.2d 943 (1967). The fourth amendment is satisfied if the subpoenaed party is allowed "to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court." *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415, 104 S.Ct. 769, 773, 78 L.Ed.2d 567 (1984). Article V, section 1 of the Utah Constitution prohibits the legislative branch or the executive branch from taking over judicial functions. As long as the district court retains ultimate precompliance control over the enforcement of a subpoena issued pursuant to the Act, the judicial function is not delegated unconstitutionally to the executive branch. *Cf. Allen v. Lindbeck*, 97 Utah 471, 480, 93 P.2d 920, 924 (Utah 1939) (determination of probable cause is a judicial function which cannot validly be delegated to an affiant). Therefore, the lack of a preissuance approval requirement does not render the Act violative of the fourth amendment or Utah's separation of powers provision if a subpoenaed party can adequately question the subpoena's reasonableness once it is issued but before compliance.[8] The ques-

tion, then, is whether precompliance review is available under the Act.

■ The Act does not expressly provide for judicial review of individual subpoenas. By the same token, it says nothing about restraining the widely recognized inherent supervisory powers courts have over judicial processes. The courts' inherent supervisory power is that which is necessary to protect the fundamental integrity of the judicial branch, and it may not be wholly delegated to a nonjudicial officer. *See* Utah Const. art. VIII, § 1, art. V, § 1. This power enables a court to ensure that the judicial process is not abused. *See State ex rel. Cranford v. Bishop*, 230 Kan. 799, 801, 640 P.2d 1271, 1273 (1982). This inherent judicial supervisory power applies not only in the context of civil cases, but also in criminal cases, *see United States v. Benz*, 282 U.S. 304, 306–07, 51 S.Ct. 113, 113–114, 75 L.Ed. 354 (1931); *Thomas v. State*, 566 P.2d 630, 637–38 (Alaska 1977) (sentencing court has inherent judicial power to reduce a sentence), in federal grand jury proceedings, *see In re Grand Jury Proceedings*, 486 F.2d 85, 93 (3d Cir.1973) (general rule that grand jury need not make a preliminary showing of the reasonableness of a subpoena did not prevent district court from imposing such a requirement as an exercise of its inherent power to supervise grand jury proceedings), and in state prosecutorial investigations, *see State ex rel. Cranford v. Bishop*, 230 Kan. at 801, 640 P.2d at 1273 (district court has inherent power to refuse to issue subpoenas). Absent an express provision attempting to restrict the authorizing court's powers, we construe the Act as not interfering with the court's exercise of inherent judicial power, and we conclude that the authorizing court has inherent authority to entertain motions challenging subpoenas and to

8. We note that neither Utah's Grand Jury Act, Utah Code Ann. §§ 77–11–4, –9 (1982 & Supp. 1987), nor a number of other state prosecutorial investigation statutes, *see, e.g.,* Kan.Stat.Ann. § 22–3101 (1981); Del.Code Ann. tit. 29, § 2508 (1979), require preissuance approval of subpoenas. Nor is such approval required in the case of subpoenas issued by the Federal Trade Commission, *see* 16 C.F.R. § 2.7 (1987), or by the Internal Revenue Service, *see* 26 C.F.R.

§ 301.7602–1 (1987). Moreover, although a federal grand jury must apply to the court for its process, Fed.R.Crim.P. 17(a); *United States v. Stevens*, 510 F.2d 1101, 1106 (5th Cir.1975), there may be little practical difference between this prior, often perfunctory, judicial review and no judicial review at all at this stage. *See In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir.1973); *In re Credit Information Corp. of New York*, 457 F.Supp. 969, 971 (S.D.N.Y.1978).

quash subpoenas.[9]

But saying that a court authorizing the use of subpoenas has inherent authority to consider motions to quash them does not fully answer respondents' challenges. The court's quashal authority must be meaningful if constitutional concerns are to be satisfied. The Act contains two provisions that bear on this point. Section 77–22–2(1) provides that subpoenas may be issued for testimony or other evidence which "may be relevant to the investigation in the judgment of the attorney general or county attorney." Respondents contend that the plain import of this provision is that the state's attorney alone is to decide whether a subpoena seeks relevant evidence. They assert that this limits the authorizing court's review of a subpoena to a mere determination of whether the state's attorney exercised good faith in issuing the subpoena and that such a limitation deprives the court of any power to review the subpoena under a standard of objective reasonableness. This, they argue, violates the state separation of powers provision, the fourth amendment's search and seizure clause, and the void for vagueness doctrine of the fourteenth amendment's due process clause.[10] We do not agree that this provision of the Act limits the courts' powers of review.

Our conclusion is guided by two rationales. First, the authorizing court has inherent authority to review subpoenas under a standard of objective reasonableness. We do not find the relevant provisions of the Act to be an express or even an implied attempt to deprive the court of that authority. Rather, it merely permits state's attorneys to proceed with investigations without requiring that they return to the court for each separate subpoena. Second, the portion of section 77–22–2(1) that permits issuance of subpoenas based on the state's attorney's judgment of relevance must be read in light of the other provisions of the Act. Section 77–22–2(1) also provides that "the attorney general or any county attorney shall have the right, upon application and approval of the district court, for good cause shown, to conduct an investigation." The only plausible reason for requiring a good cause showing is to limit the scope of the authorized investigation accordingly. That provision would be meaningless if the state's attorneys were allowed to issue subpoenas based solely on their subjective determination of relevance without regard to whether that judgment bore any objective relation to the scope of the court's authorization for the investigation.

■■■■ Accordingly, we conclude that an investigation conducted under the Act must proceed as follows: First, the overall inves-

9. *Cf.* Utah Code Ann. §§ 78–7–5, –17 (1987) (powers of courts), §§ 78–24–5 to –7 (subpoenas); Utah R.Civ.P. 45 (subpoenas). We emphasize that the court's power to quash subpoenas inheres in the judiciary and is not founded on any particular statutory provision. It is true that rule 14(b) of the Utah Rules of Criminal Procedure expressly states that courts may quash or modify subpoenas if compliance would be unreasonable. This provision is qualified, however, by rule 14(a), which discusses subpoenas "to require the attendance of a witness or interpreter before *a court, magistrate or grand jury* in connection with a criminal investigation or prosecution." (Emphasis added.) A subpoena issued pursuant to the Act compels the attendance of a witness before *a prosecutor.* Therefore, a court's rule 14(b) quashal authority does not appear to cover subpoenas issued during a criminal investigation conducted pursuant to the Act.

10. Respondents base their vagueness argument on *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). They ask that we apply the vagueness doctrine to the Act because, although it "focuses both on actual notice to citizens and arbitrary enforcement ... the more important aspect of the vagueness doctrine 'is ... the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Id.* at 357–58, 103 S.Ct. at 1858–59 (citation omitted). The attorney general contends that the vagueness doctrine has no application to a nonpenal statute such as the Act. Instead, he claims that the doctrine applies only to requiring that governments provide adequate notice of a law to individuals when sanctions may be imposed for misconduct and notes that despite *Kolender's* emphasis on "guidelines to govern law enforcement," it concerned a criminal statute and its holding must be so limited. We need not reach this issue in the present action because we find that the Act is not sufficiently unclear to create a serious problem of interpretation, much less one of constitutional magnitude.

tigation may be approved only after the district court has made an objective determination that "good cause" has been shown.[11] Second, each individual subpoena may be issued only after the investigating attorney has made a good faith determination that the testimony or other evidence being sought is reasonably relevant to the authorized investigation. Third, a person to whom a subpoena has been issued must be afforded an opportunity to challenge the subpoena at some time prior to compliance. The authorizing court has the power to entertain motions to quash and, upon motion, must quash any individual subpoena that does not meet an objective standard of reasonableness when measured against the good cause showing made in the application for investigation.[12]

In sum, we find that the district court's express authority under the Act to authorize a criminal investigation, along with its inherent authority to supervise each investigation to ensure that the judicial subpoena power is not abused, satisfies any constitutional concerns about the adequacy of judicial control over the state's attorney's criminal inquiry. We now turn to considering the Act's procedural defects.

### 2. Procedural Safeguards

Respondents argue that the Act does not provide adequate protections for the privilege against self-incrimination and the due process right to present evidence and cross-examine witnesses. They also contend that the Act fails to ensure that adequate records of investigations will be maintained so that investigations can be supervised by the courts. Finally, they argue that there are inadequate limitations on the operation of the Act's secrecy provisions. The attorney general argues that the right to counsel provided for in the Act is sufficient to assure that a witness's fundamental rights will be protected. He also contends that other procedural safeguards can be supplied by judicial interpretation. We find that the constitutional concerns respondents raise are satisfied by our construction of the Act as incorporating a number of procedural safeguards.

#### a. *Privilege Against Self-Incrimination*

Relying on both the state and federal constitutions, respondents claim that per-

---

**11.** Although the Act does not define "good cause," respondents do not challenge either the constitutional sufficiency of the statutory standard or the district court's finding in the UP & L investigation that the standard was satisfied by the attorney general's affidavit and application. Justice Stewart's dissent suggests that the "good cause" standard has so little substance that it leaves the state's attorneys free to engage in wide-ranging investigations without effective judicial limitation. Although we do not have occasion today to reach the question of the precise definition to be given the term "good cause," we think it clear that the standard does *not* allow the initiation of an investigation on mere whim or pretext. While mere suspicion may be enough to institute a routine police investigation, it is clearly not enough to justify putting the judicial subpoena power into the hands of prosecutors, even with the protections we imply into the Act today.

**12.** On the record before us, we do not attempt to define in detail the parameters of this objective standard of reasonableness. We note, however, that the reasonableness or relevance of a subpoena issued in the context of an investigation is measured by less exacting standards than one issued during the course of a trial. *In re Grand Jury Investigation,* 381 F.Supp. 1295, 1299 (E.D. Pa.1974); *accord United States v. McKay,* 372 F.2d 174, 176 (5th Cir.1967) (relevancy and ma-

teriality of subpoenas have broader connotations in the context of an administrative agency investigation than in a trial setting). This is true whether the investigation is conducted by a federal or state grand jury, an administrative agency, or a state's attorney pursuant to the Subpoena Powers Act. For, regardless of the differences between those entities, each has "a legitimate right to satisfy [itself] that corporate [or individual] behavior is consistent with the law and the public interest." *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368–69, 94 L.Ed. 401 (1950) (administrative agency). And in so doing, the investigator may run down every available clue and examine witnesses in every proper way to discover whether the law has been violated. *United States v. Stone,* 429 F.2d 138, 140 (2d Cir.1970) (federal grand jury).

> Of course a governmental investigation ... may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power.... But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.

*United States v. Morton Salt Co.,* 338 U.S. at 652, 70 S.Ct. at 369.

sons subpoenaed under the Act are entitled to assert a privilege against self-incrimination. They contend that the Act is constitutionally deficient because it lacks the procedural safeguards necessary to permit the effective exercise of the privilege. Specifically, they argue that the Act does not require investigators to notify subpoenaed persons of the following: the general scope of the investigation; the right to exercise their privilege against self-incrimination; their status as targets of the investigation; and the nature of the charges being contemplated against them.[13]

The first question is whether the privilege against self-incrimination is available to those subpoenaed. The Act does not specifically provide for the exercise of a privilege against self-incrimination. However, section 77–22–3, which provides a procedure for compelling testimony by court order, does refer to "a person [who] refuses to answer a question or produce evidence of any kind on the ground that he may be incriminated thereby." The section provides that the state's attorney may grant such a person transactional immunity and obtain a court order compelling his or her testimony. It further provides that the witness shall be immune if he or she complies with the order and "would have been privileged to withhold the answer given or the evidence produced by him except for this section." These references clearly imply that the legislature assumed witnesses subpoenaed under the Act would be able to claim a privilege against self-incrimination. We think this assumption was correct. Both the state and federal constitutions appear to require that persons subpoenaed under the Act have the right to assert the privilege against self-incrimination. The fifth amendment to the United States Constitution provides, "No person ... shall be compelled in any criminal case to be a witness against himself...." Article I,

section 12 of the Utah Constitution states, "In criminal prosecutions the accused ... shall not be compelled to give evidence against himself...." These provisions grew out of a shared Anglo–American legal history. *See* M. Berger, *Taking the Fifth: The Supreme Court and the Privilege Against Self-Incrimination* (1980) [hereinafter Berger]; L. Levy, *Origins of the Fifth Amendment: The Right Against Self-Incrimination* (1968); 8 Wigmore, *Evidence* § 2250 (McNaughton rev. 1961); Corwin, *The Supreme Court's Construction of the Self-Incrimination Clause*, 29 Mich.L.Rev. 1 (1930); Pittman, *The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America*, 21 Va.L.Rev. 763 (1935) (hereinafter Pittman]. Both provisions have been interpreted broadly to incorporate the common law understanding of the right to remain silent. *Ullmann v. United States*, 350 U.S. 422, 450–53, 76 S.Ct. 497, 513–15, 100 L.Ed. 511 (1956) (Douglas, J., dissenting); *American Fork City v. Crosgrove*, 701 P.2d 1069, 1072–73 (Utah 1985). To the extent that the common law defines the privilege, the federal and state provisions have been interpreted similarly.[14]

Although both the federal and Utah constitutions refer to the availability of the privilege in the context of criminal cases, under both the privilege has been held to be available in any proceeding conducted by the government, civil or criminal, investigatory or adjudicatory, so long as an answer might incriminate the witness and a possibility exists that a criminal action might be filed or a criminal conviction secured. *In re Gault*, 387 U.S. 1, 47–48, 87 S.Ct. 1428, 1454–55, 18 L.Ed.2d 527 (1967); *First Fed. Sav. & Loan Ass'n v. Schamanek*, 684 P.2d 1257, 1261–62 (Utah 1984); *Affleck v. Third Judicial Dist. Court*, 655

---

**13.** Respondents also argue that these procedural deficiencies violate the federal prohibition against unreasonable searches and seizures by preventing subpoenaed persons from effectively raising precompliance challenges. We do not reach that argument because our construction of the Act eliminates any such procedural defects.

**14.** However, when contemporary questions outside the realm of the common law arise, differing federal and state sensitivities or policy objectives may result in different protections. *Cf. State v. Earl*, 716 P.2d 803, 805–06 (Utah 1986) (inviting argument on the differing scope of protection under the state and federal constitutional search and seizure provisions).

P.2d 665, 666–67 (Utah 1982). On the basis of these precedents alone, we find that the privilege must be available in criminal investigations authorized and conducted pursuant to Utah's Subpoena Powers Act. Indeed, the privilege's availability may be even more critical in such investigations than in ordinary criminal trials. Not only are there fewer procedural protections during Subpoena Powers Act investigations, but the substantive standards may be lower than in ordinary criminal prosecutions. For example, section 77–22–2(1) of the Act permits the state's attorneys to initiate an investigation "for good cause shown." Although the present case does not present the question of precisely defining what that phrase means, on its face it appears that the Act may not require the same showing of probable cause that is necessary to bring a criminal charge, and the Act does not expressly require an allegation of any specific criminal violation, as is true of criminal informations and indictments, although there certainly must be some specificity to any "good cause" statement lest the Act tempt the state to poke "about in the speculation of finding something chargeable." 8 Wigmore, *Evidence* § 2251, at 314 (McNaughton rev. 1961). This is an additional and independent reason for finding that the privilege against self-incrimination must be available in these circumstances.

We next consider the contours of the privilege in the context of a Subpoena Powers Act investigation. First, who may exercise the privilege? At common law, the privilege was available to witnesses as well as accused persons. Berger, *supra* p. 645, at 56. That is the interpretation given the fifth amendment, which states that "no person" shall be compelled to testify against himself. *See, e.g., United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976).

■ Article I, section 12 of the Utah Constitution is arguably narrower because it states only that "the accused" has the privilege. This could lead to the conclusion that article I, section 12's protection was intended only for persons against whom charges have been brought or who have been identified as targets of a criminal investigation. We reject that narrow interpretation and embrace the common law approach. All witnesses must be able to claim the privilege if the purposes of the privilege are to be satisfied—to protect those testifying from the risk of incriminating themselves. *See, e.g., State v. Ruggeri,* 19 Utah 2d 216, 222–23, 429 P.2d 969, 973 (1967)` (ordinary witness before state grand jury may claim the privilege, as may witness who has been identified as target).

■ The next issue is the scope of the privilege. We note several aspects, beginning with the question of whether a witness may remain completely silent or is privileged only to refuse to answer specific questions. Section 77–22–3 of the Act refers to the exercise of the privilege as a refusal "to answer a question." We think that by using this language, the legislature indicated its intent that there be no general right to remain silent. Rather, the language shows an intent to require subpoenaed witnesses to answer all questions except those individual questions calling for an incriminating response. Although the parties here have not directly addressed this issue, we think it useful to briefly consider whether this interpretation of the statute will pass constitutional muster.

This interpretation does not appear to violate the fifth amendment's protection of the privilege. The United States Supreme Court has held that although a criminal suspect has an absolute right to remain silent in a police custodial interrogation, *see Michigan v. Mosley,* 423 U.S. 96, 100–04, 96 S.Ct. 321, 324–26, 46 L.Ed.2d 313 (1975), and even though a criminal defendant may refuse to testify at all at his or her trial, *see Allen v. Illinois,* 478 U.S. 364, 366–369, 106 S.Ct. 2988, 2991–92, 92 L.Ed.2d 296, 303–04 (1986), a witness appearing before a federal grand jury "has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim" as to the particular question. *United States v. Mandujano,* 425 U.S. at 581, 96 S.Ct. at 1778–79 (plurality opinion). Given this holding regarding grand jury witnesses, it appears that the fifth amendment does not preclude

a similarly limited scope of the privilege for Subpoena Powers Act witnesses.

Applying our state constitutional privilege, Utah Const. art. I, § 12, in *State v. Ruggeri*, 19 Utah 2d at 222–23, 429 P.2d at 973, we stated, "An ordinary witness before a [state] grand jury must give testimony except where it might incriminate him [or her] for some past misdeed...." Although the question we address here was not directly at issue in *Ruggeri*, and while we might find a broader scope for the privilege under other circumstances, for present purposes we think that this interpretation of the Act, which limits the privilege to specific incriminating questions, satisfies the requirements of our state constitution as interpreted in *Ruggeri*.

Several other aspects of the state and federal constitutionally based privileges should be noted. Despite differences in the language of the constitutional provisions, both privileges have been interpreted to apply only to testimonial or communicative disclosures. *See, e.g., Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830–31, 16 L.Ed.2d 908 (1966); *American Fork City v. Crosgrove*, 701 P.2d 1069, 1071–75 (Utah 1985).[15] Moreover, both privileges have been held to apply to both oral and written communicative disclosures. *See, e.g., Boyd v. United States*, 116 U.S. 616, 633–35, 6 S.Ct. 524, 533–35, 29 L.Ed. 746 (1886); *Crosgrove*, 701 P.2d at 1076 (Stewart, J., concurring). *But cf. Fisher v. United States*, 425 U.S. 391, 408–14, 96 S.Ct. 1569, 1579–82, 48 L.Ed.2d 39 (1976). With respect to written disclosures, the fifth amendment privilege appears to be limited to private, personal papers. *See Andresen v. Maryland*, 427 U.S. 463, 474, 96 S.Ct. 2737, 2745, 49 L.Ed.2d 627 (1976). We have not considered a private-paper restriction under article I, section 12, *but see Crosgrove*, 701 P.2d at 1075–77 (Stewart, J., concurring), and because our deci-

sion does not depend on the outcome of that question, we do not reach it today. The federal privilege has virtually been restricted to natural persons, although the United States Supreme Court has not foreclosed the possibility that the privilege might protect some entities which may be closely aligned with individuals' privacy interests. *See Bellis v. United States*, 417 U.S. 85, 101, 94 S.Ct. 2179, 2189–90, 40 L.Ed.2d 678 (1974); *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). On the record before us, we decline to consider here whether article I, section 12's privilege might be available to entities other than natural persons. However, we observe that the resolution of such questions will not necessarily follow the federal model. *See* note 14 *supra*.

Having canvassed the privilege, we now address respondents' contention that the Act provides inadequate procedural safeguards to ensure that subpoenaed persons have a meaningful opportunity to exercise that privilege. No court has considered the procedures necessary to safeguard the privilege during an interrogation comparable to that contemplated by the Act. We find instructive, however, procedural rulings issued in the context of police custodial interrogations and grand jury investigations.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court ruled that to secure an individual's fifth amendment privilege in a police custody setting, the individual must be warned prior to interrogation that (i) he or she has a right to remain silent, (ii) any statement made may be used as evidence against the individual, and (iii) he or she has the right to be represented by an attorney during interrogation, whether retained or appointed. However, when confronted with the ques-

---

**15.** Section 77–22–3 of the Act also refers to the privilege in the context of a refusal to "produce evidence of any kind." This might be interpreted as an indication that the legislature intended to extend the privilege to evidence which is not communicative in nature. In *Crosgrove*, 701 P.2d at 1075, we held that the state constitutional privilege did not prevent the state from com-

pelling a suspect to take a breathalyzer test. In view of our extensive discussion in that case and in the absence of further indication of legislative intent, we conclude that the privilege available in proceedings under the Act is limited to testimony and evidence of a testimonial or communicative nature. Utah Code Ann. § 77–22–3 (1982).

tion of whether complete *Miranda* warnings need be provided to a federal grand jury witness, the Court answered "no." *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (plurality opinion). The Court found that the relatively less coercive atmosphere of a grand jury setting justified fewer protections than *Miranda* requires for police custodial interrogations. 425 U.S. at 579–80, 96 S.Ct. at 1777–78. However, the Court has not yet determined whether there are coercive elements in a grand jury setting sufficient to require some shorter form of warning pursuant to the fifth amendment. *See id.* 425 U.S. at 582 n. 7, 96 S.Ct. at 1779 n. 7; *United States v. Washington,* 431 U.S. 181, 188–89, 97 S.Ct. 1814, 1819–20, 52 L.Ed.2d 238 (1977); *United States v. Wong,* 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977).

Turning to the Subpoena Powers Act, we conclude that interrogations conducted pursuant to the Act raise sufficient self-incrimination concerns that some form of warning is required if the privilege is to be meaningfully available. We think that an interrogation pursuant to the Subpoena Powers Act, though comparable in many respects to an appearance before a grand jury, is more coercive and thus raises greater self-incrimination concerns. Differences between the two investigative procedures give interrogations conducted pursuant to the Act a distinctly greater law-enforcement tone. In turn, the psychological compulsion facing a Subpoena Powers Act witness is greater than that which confronts a grand jury witness. For example, a Subpoena Powers Act interrogation is not conducted in the presence of a citizen panel, but before a prosecutor or a team of prosecutors and staff. In addition, it may be held "anywhere within the jurisdiction of the prosecutor," including the prosecutor's office. Utah Code Ann. § 77–22–2(2). To one interrogated in such a setting, with only the state's investigators, a transcriber, and possibly the subpoenaed party's attorney present, the psychological compulsion

may be more analogous to that present in a police custodial inquiry, rather than one before a grand jury. Because the privilege is intended to protect against confessions secured by the sheer force of psychological intimidation, *see generally* 8 Wigmore, *Evidence* § 2251 at 314–17 (McNaughton rev. 1961); Berger, *supra* p. 645, at 31–35, we conclude that both the fifth amendment and article I, section 12 of the Utah Constitution[16] mandate the procedural protections outlined below.

Although the coercive nature of a Subpoena Powers Act interrogation requires that some form of warning be given to preserve the right in a meaningful fashion, we do not think the exact warnings mandated by *Miranda* are sufficient or appropriate in the context of such a proceeding. For example, *Miranda* requires a warning that the person being interrogated has a right to remain completely silent. As discussed above, the Act does not require and we have not found that our state constitution mandates a right of complete silence in such interrogations, but only a right of silence as to specific questions which call for incriminating responses. *Cf. United States v. Mandujano,* 425 U.S. at 580, 96 S.Ct. at 1778 (no right of complete silence for grand jury witness).

 Using the *Miranda* warnings as a general guide, we hold that to guarantee witnesses the privilege against self-incrimination under both the fifth amendment and, independently, article I, section 12 of the Utah Constitution, the state's attorneys must notify every witness prior to interrogation (i) of the general subject matter of the investigation, (ii) of the existence and nature of the privilege against self-incrimination, (iii) that any information provided may be used against the witness in a subsequent criminal proceeding, and (iv) of the right to have counsel present. Relying only on article I, section 12 of the Utah Constitution, we add a further requirement that if a witness is the target of an investigation, he or she must be so informed prior

16. We emphasize that this holding is based independently on our state constitution so as to eliminate any suggestion that we rely solely on the federal fifth amendment. *See Michigan v. Long,* 463 U.S. 1032, 1040–42, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983).

to interrogation. These requirements warrant some discussion.

The first warning we require must inform the witness of the general subject matter of the investigation. No such requirement exists under *Miranda*. However, in a police custody setting, the person being interrogated almost certainly will know the nature of the crime being investigated, either because he or she has already been placed under arrest or because of precustodial questioning or events. This is not true in a Subpoena Powers Act setting. Under the Act, it is likely that no criminal charges will have been filed against anyone, nonsuspects may be questioned, and the witness may have no idea why he or she has been subpoenaed. Under such circumstances, we conclude that a witness will be in a position to exercise his or her privilege against self-incrimination only if first made aware of the general subject matter of the investigation by a statement from the state's attorney couched in terms similar to those used in the good cause affidavit that provided a factual basis for the authorization of the investigation.

It may be argued that such a statement is unnecessary, because as explained below the application and supporting good cause affidavit specifying the nature of the investigation must be a matter of public record. A diligent witness could easily obtain the affidavit from the clerk of the authorizing court and inform him- or herself of the nature of the investigation. But we reject this line of reasoning. Such imputed notice will not suffice to protect the witness's rights. The subpoena might not refer the witness either to the Act or to the good cause affidavit; therefore, few can be expected to know of their right to examine the affidavit. The only way that this interest can be adequately guaranteed is to require the state's attorney to inform the witness of the subject matter of the investigation.

The second warning we require—that the subpoenaed person may refuse to answer any question or produce any evidence of a communicative nature that may result in self-incrimination—"is indispensable to ...

insure that the individual knows that he [or she] is free to exercise the privilege" at any point during the proceeding. *Miranda v. Arizona*, 384 U.S. at 469, 86 S.Ct. at 1625. The third warning—that any information provided may be used against the individual in court—simply amplifies the second required warning by notifying the witness of the consequences of waiving the privilege. *See id.*

The fourth warning—that the witness may have counsel present—derives from *Miranda* and independently from the express terms of the Subpoena Powers Act, which requires that the subpoena itself notify a witness of his or her right to be represented by an attorney. Utah Code Ann. § 77-22-2(2) (1982). We think that this notice must be given again prior to any questioning of a witness. This restatement is necessary because the witness's knowledge of his or her right cannot be presumed and because the witness's view on whether he or she wants counsel present during the interrogation may change upon learning of the subject matter under investigation and of the possibility that any information provided may be used against the witness in a later criminal prosecution.

The fifth and final warning we construe the Act as requiring is applicable only to "targets" of the investigation. Such persons must be notified prior to questioning or the compelled production of evidence of their target status and of the nature of the charges under consideration against them. Respondents argue that such warnings are required by both the fifth amendment and our state constitution.

In *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1819-20, 52 L.Ed.2d 238 (1977), the United States Supreme Court rejected an argument that the fifth amendment required target warnings in federal grand jury proceedings. The Court held that target warnings would "add nothing of value" in such proceedings because all witnesses, whether targets or not, were otherwise adequately protected from compulsory self-incrimination. *Id.* *Washington* may be distinguishable from the present case on its facts. The witness

in *Washington* was undoubtedly aware of his target status, despite the investigators' failure to give him notice. *Id.* And, as we have noted previously, grand jury proceedings such as those at issue in *Washington* are not as inherently coercive, for fifth amendment analysis, as interrogations under the Subpoena Powers Act. Nevertheless, the entire tone of *Washington* constrains us from finding that the federal constitution requires routine target warnings in the context of all Subpoena Powers Act interrogations.

■ The next question is whether, as a matter of state law, we will require target warnings. Article I, section 12 of the Utah Constitution is worded similarly to the federal fifth amendment. And, as we noted earlier, the state and federal privileges against self-incrimination share common-law roots. However, that fact does not necessarily require parallel construction. Differing state and federal experiences, concerns, and policy objectives may lead to differing interpretations of the two constitutional privileges in circumstances not addressed by the shared common law. The propriety of divergent construction has already been assessed with respect to the need for target warnings. Fully ten years before *Washington,* this Court ruled in *State v. Ruggeri,* 19 Utah 2d 216, 225, 429 P.2d 969, 975 (1967), that article I, section 12 requires that state grand jury witnesses be notified of their target status and of the charges being considered against them.[17] At this time, we see no reason to reexamine our holding in *Ruggeri,* and we think that Subpoena Powers Act targets are similarly situated with respect to their privilege against self-incrimination as are state grand jury targets. Therefore, we hold that the target warnings required by *Ruggeri* must be given to Subpoena Powers Act targets,[18] and we read such a requirement into the Act. Utah Const. art. I, § 12.

17. The target warning requirements of *Ruggeri* have since been codified, Utah Code Ann. § 77-11-3(2) (1982).

18. We further note our disagreement with the United States Supreme Court's suggestion in

### b. *Rights to Present Evidence and Confront Witnesses*

■ Respondents next contend that the Act denies them due process as guaranteed by the fourteenth amendment to the federal constitution because persons targeted for investigation are not provided an opportunity to confront and cross-examine adverse witnesses or to present evidence in their defense. They argue that such rights are necessary because of the accusatory nature of the proceedings. We conclude that such opportunities are not required because Subpoena Powers Act investigations are merely preliminary to the type of formal adjudicatory proceedings where such procedural guarantees are constitutionally required.

The fourteenth amendment prohibits the state from depriving investigation targets of "liberty" or "property" without due process. Respondents have not clearly defined the liberty or property interests that allegedly are at stake here. We assume that they refer to the infringement of liberty that would occur if the investigation ultimately led to a criminal conviction or to the injury to property that might result if an investigation were carried out publicly and led to a loss of employment or business opportunities. Assuming without deciding that some protected interest is at stake, we must determine what form of "process" is due under the fourteenth amendment and what procedural protections the state must afford one who is the potential target of a Subpoena Powers Act investigation.

In a series of cases, the United States Supreme Court has established a system of classifying agency proceedings and describing generally the type of safeguards required in each class of proceedings. These cases indicate that the requirements of due process vary depending on the nature and purpose of the proceeding and the likelihood that it will result in the deprivation of

*Washington* that target warnings are worthless, and we observe that requiring warnings will not impose a significant burden on state investigators or impede legitimate inquiries.

liberty or property. *Hannah v. Larche,* 363 U.S. 420, 440–42, 80 S.Ct. 1502, 1513–1515, 4 L.Ed.2d 1307 (1960). All proceedings fall into one of two major categories: adjudicative or investigative. Adjudicative proceedings are essentially judicial in nature and result in binding determinations that directly affect legal rights. The full panoply of procedural safeguards available in judicial proceedings are therefore available in adjudicative proceedings, including the rights to present evidence and cross-examine witnesses. *See, e.g., Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959); *see also Morgan v. United States,* 304 U.S. 1, 19–22, 58 S.Ct. 773, 776–778, 82 L.Ed. 1129 (1938); *Ohio Bell Tel. Co. v. Public Util. Comm'n,* 301 U.S. 292, 300–05, 57 S.Ct. 724, 728–31, 81 L.Ed. 1093 (1937); *Southern Ry. Co. v. Virginia,* 290 U.S. 190, 54 S.Ct. 148, 78 L.Ed. 260 (1933). On the other hand, investigative proceedings do not result in final determinations that directly affect legal rights, but only in findings presented for possible legislative or executive action.

A Subpoena Powers Act investigation does not result in any final determinations, rulings, or orders. Therefore, it does not qualify as adjudicative and must be investigative. However, that classification does not tell us what procedures due process requires, because the United States Supreme Court's cases suggest three recognizable subcategories of investigative proceedings with different procedural demands. These subcategories are based on three rather distinct possible functions. Specifically, an investigative proceeding may (i) perform an accusative function, (ii) constitute a preliminary step to later adjudicative proceedings, or (iii) accomplish a legislative or executive fact-finding purpose. A Subpoena Powers Act investigation must be classified according to these subcategories before we can determine whether potential targets have the right to cross-examine witnesses and adduce evidence during the investigation.

An investigative proceeding is deemed to perform an accusative function if its purposes are (i) to find that certain persons are responsible for crimes or other prohibited acts and (ii) to expose or publicize the names of those persons. *Jenkins v. McKeithen,* 395 U.S. 411, 425–28, 89 S.Ct. 1843, 1850–51, 23 L.Ed.2d 404 (1969). Because such a proceeding effectively brands an individual a wrongdoer before the public without a trial, it is considered to be so closely. analogous to an adjudicative proceeding in terms of injury to the accused that a number of procedural protections must be provided, including the rights to present evidence and to cross-examine witnesses. *Id.* at 427–29, 89 S.Ct. at 1851–53.

The second analytical category of investigative proceedings includes those that function as information-gathering mechanisms that may be preliminary to a subsequent formal adjudicative proceeding. *See, e.g., Anonymous Nos. 6 and 7 v. Baker,* 360 U.S. 287, 291, 79 S.Ct. 1157, 1159–60, 3 L.Ed.2d 1234 (1959). The full procedural safeguards appropriate in adjudicative or accusative investigative proceedings are not required in preliminary investigative proceedings because the affected party will have a full opportunity to defend against any charges with all procedural protections in any subsequent adjudication and because such safeguards likely would unduly hinder the investigation. *Hannah v. Larche,* 363 U.S. at 446, 80 S.Ct. at 1516–17; *In re Groban,* 352 U.S. 330, 332, 77 S.Ct. 510, 512–13, 1 L.Ed.2d 376 (1957).

The third category of investigative proceedings—those that perform a legislative or executive fact-finding function—includes proceedings conducted by agencies that find facts and, perhaps, make recommendations to other bodies, but do not take action directly affecting legal rights. Proceedings with such aims need not provide any of the procedural safeguards traditionally associated with the judicial process. *Hannah,* 363 U.S. at 442–46, 80 S.Ct. at 1514–17; *see, e.g., Groban,* 352 U.S. at 332, 77 S.Ct. at 512–13.

Realistically, many agency investigations do not fit neatly into one of these rather abstract categories. When faced with such a proceeding, the courts must evaluate the totality of the circumstances to determine the predominant character of the proceed-

ing before classifying it. *See, e.g., Hannah,* 363 U.S. at 442, 80 S.Ct. at 1514–15; *Jenkins v. McKeithen,* 395 U.S. at 427–30, 89 S.Ct. at 1851–53; *Groban,* 352 U.S. at 332–33, 77 S.Ct. at 512–13. Certainly, such an evaluation is not entirely objective, but the categories do provide a useful framework for a due process balancing analysis.

The question is, into which of these categories does a Subpoena Powers Act investigation fall? Having considered the function of the investigation in relation to formal criminal proceedings, the likelihood of injury to targeted persons caused by the investigation, and the burden that full procedural safeguards would place on the agency in question, we conclude that Subpoena Powers Act proceedings are most closely analogous to preliminary investigative proceedings. To elaborate, the Act is intended to supplement existing law enforcement mechanisms and to enable the state's attorneys to gather sufficient evidence with which to initiate formal adjudicative criminal proceedings. Investigations under the Act do have an accusative tone to the extent that they may lead the state's attorneys to find that named individuals are responsible for wrongdoing. However, that finding does not have final legal consequences; it only leads to the filing of criminal charges. In that respect, the state's attorneys' preliminary finding of wrongdoing is virtually indistinguishable from the same conclusion reached after an informal criminal investigation conducted without benefit of the Subpoena Powers Act procedural safeguards. And the declared purpose of the Act—to keep investigations secret—clearly indicates that the Subpoena Powers Act investigation does not have the purpose of advertising the names of those who the state's attorneys may conclude are wrongdoers. *See* Utah Code Ann. § 77–22–1 (1982).

It is true that investigations under the Act are not mere legislative fact-finding proceedings. They do have some impact on constitutionally protected liberty and property interests because their obvious and declared purpose is to aid in criminal investigations. The likelihood that criminal prosecution will follow an investigation justifies some procedural safeguards. But so long as the names of subpoenaed persons or targets are not publicized—and the Act contemplates that they will not be—the likelihood of injury to a protectible interest of the investigated party is not as high as that which exists in accusative proceedings and is no greater than that which attends general criminal investigations.[19] In these circumstances, we find that the due process balance is satisfied if targets and other witnesses are provided the safeguards we have already discussed—the right to counsel, the privilege against self-incrimination, notice of these rights and of the nature of the investigation, and target warnings.[20] We reject respondents' claims that they should be afforded the rights to present evidence and cross-examine witnesses during the investigation. Such rights would prolong and complicate the investigative process, unduly hindering the state's ability to uncover and prosecute crimes, without conferring any significant benefit on the investigated person that would not be provided at a preliminary hearing if charges were filed. Those rights are unnecessary at the investigative stage so long as they are afforded later. *Cf.* Utah Code Ann. § 77–11–4 (1982) (grand jury not bound to give target opportunity to present exculpatory evidence).

**19.** Our federal due process analysis might well differ if the state were to conduct an investigation in a highly public manner, contravening the Act's declared purpose of secrecy to protect the innocent.

**20.** Future abuses of the powers granted by the Act may, however, require that additional rights and warnings be given to subpoenaed persons. If we conclude after further experience that Subpoena Powers Act interrogations are as coercive as custodial police interrogations, subpoenaed persons who cannot afford to retain counsel would have to be accorded and notified of the right to appointed counsel. And even though this decision does not require the state's attorneys to notify subpoenaed persons of their right to challenge subpoenas, experience may show that such a warning is necessary to meaningfully protect witnesses from governmental overreaching.

### c. *Record–Keeping Requirements and Secrecy Provisions*

Respondents also contend that the Act requires only limited record keeping and allows far-reaching secrecy orders. This, respondents assert, violates the fourth amendment because the lack of a sufficient record and the operation of the secrecy provisions will make effective precompliance challenges to subpoenas impossible. Respondents also claim that the secrecy provisions are void for vagueness under the fourteenth amendment's due process clause. Finally, respondents argue that the secrecy provisions encourage investigators to engage in forum shopping in violation of our state due process provision. Utah Const. Art. I, § 7. We conclude that the Act is subject to a reasonable interpretation which dispels respondents' constitutional concerns.

We first address the claim that the Act does not contemplate the keeping of adequate records.[21] It is true that the Act does not include a provision expressly referring to a requirement that records of investigations be kept. However, the Act does contain references which suggest that the legislature fully anticipated detailed record-keeping. Section 77–22–2(1) requires the state's attorneys to make application, including a showing of good cause, in order to receive court approval for an investigation. Section 77–22–2(2) refers to the issuance of subpoenas. Section 77–22–2(3) requires a written application for a court order of secrecy. Section 77–22–3 requires a written application for a court order compelling testimony from a person to whom transactional immunity has been granted. These references, as well as others in the statute, make it clear that the legislature presumed a written record would be kept of every investigation conducted under the Act. This conclusion is bolstered by the legislature's inclusion of

extensive secrecy provisions which would have very limited value if there were no written records to be kept secret. It is also supported by the requirement that a complete record be kept of the somewhat analogous secret grand jury proceedings. *See* Utah Code Ann. §§ 77–11–9(4), (6) (Supp. 1987).

There is an additional, and perhaps stronger, reason why an official record of a Subpoena Powers Act investigation must be maintained. At the heart of the Act is the use by state's attorneys of subpoenas issued under authority of district courts. The courts have inherent authority to supervise the use of this process for the purpose of assuring that it is not abused. Utah Const. Art. VIII, § 1, Art. V, § 1. See discussion *supra* part IV.A.1 of this opinion. To exercise this authority effectively, the courts must have access to a complete record of the investigation. Similarly, any appellate court that may review rulings of a district court on matters relating to the investigation must have available to it a complete record of the legal and factual context of the district court's ruling.

 In light of (i) the legislature's apparent intent that a full record of the investigation be kept, (ii) the need to ensure that authorizing courts have sufficient information to effectively exercise their inherent supervisory power over their process and to determine the merits of challenges to the conduct of the investigation, and (iii) the appellate courts' requirement of an adequate record, as a matter of statutory construction and in the exercise of our inherent supervisory power over the judicial branch, *e.g., In re Clatterbuck,* 700 P.2d 1076, 1081 (Utah 1985), we conclude that all investigations must be fully documented and such documentation shall be maintained by the district court authorizing the investigation.

---

**21.** A somewhat related question is respondents' claim that the secrecy provisions of the Act mean that once a secrecy order is entered, virtually no record need be kept of an investigation. The secrecy provisions are discussed generally below. But it suffices on this point to observe that there is nothing in the Act that would support the conclusion that the secrecy provisions in any way relieve the court or the state's attorneys of the obligation to maintain records of the investigation. The secrecy provisions operate only to limit those who may have access to the records that are maintained.

■ At this time, we cannot determine with precision what documentation will be necessary in each investigation conducted under the Act. However, the operation of the statute and the needs of the supervising courts dictate that the following be among the documents that form the permanent record of any investigation: (i) the application for authorization to commence an investigation, together with the supporting good cause statement; (ii) all motions made to the court; (iii) all orders of the court concerning the investigation, including the original order authorizing the investigation and any orders modifying its scope or duration; (iv) copies of all subpoenas issued; (v) detailed descriptions of all documents or other evidence produced in response to subpoenas;[22] (vi) copies of all transcripts of testimony prepared; and (vii) all communications between the state's attorneys or their staffs and the court.

The need for these items of information is apparent. For example, unless the good cause statement is preserved, as well as any other orders concerning the investigation's scope and duration, there will be no way for a court to judge whether the state's attorney is exceeding the scope of his or her authority. Moreover, absent such a record, the recipient of a subpoena would have no way to judge its propriety. In a similar vein, unless the investigators' use of the court's subpoena power is fully documented by copies of subpoenas,[23] transcripts of testimony,[24] and documents produced, the court would have no way to supervise that use effectively. Finally, in the absence of a record of all communica-

tions between the state's attorney and the court and of all actions sought from and orders entered by the court, it would be impossible for an appellate court to consider whether the district court was properly supervising the use of its subpoena powers. The foregoing provides sufficient recordkeeping requirements to enable the Act to pass constitutional muster and to ensure a proper supervisory role for authorizing courts.

Respondents also challenge the constitutionality of the Act's secrecy provisions. Section 77–22–2(3) of the Act provides that the investigating attorney

> may make written application to any district court and the court may order that interrogation of any witness shall be held in secret; that such proceeding be secret; and that the record of testimony be kept secret unless and until the court for good cause otherwise orders. The court may order excluded from any investigative hearing or proceeding any persons except the attorneys representing the state and members of their staffs, the court reporter and the attorney for the witness.

Respondents read these provisions broadly as giving the state's attorneys vast power to conduct investigations outside judicial constraints. This power, they assert, is inconsistent with the requirements of state and federal due process. U.S. Const. amend. XIV; Utah Const. art. I, § 7. They also argue that the scope and operation of the secrecy provisions are so poorly defined that the Act fails to provide the courts or

---

**22.** The written description of documents, in most cases, would consist of a list of the documents and a brief description of the substance of each. This requirement is not intended to saddle the investigating agency or the authorizing court with a heavy burden of document management. The descriptions need only be sufficient to reasonably document the course of the investigation.

**23.** Copies of subpoenas may be necessary, among other reasons, for court protection of targets who are unable to challenge subpoenas on their own. For example, a broad subpoena issued to a third party may invoke a target's privacy interests. *See, e.g., Tiffany Fine Arts, Inc. v. United States,* 469 U.S. 310, 322, 105 S.Ct.

725, 732, 83 L.Ed.2d 678 (1985). Although under federal law it has been held that a target cannot challenge the investigation of a third party, *SEC v. Jerry T. O'Brien, Inc.,* 467 U.S. 735, 741–42, 104 S.Ct. 2720, 2725, 81 L.Ed.2d 615 (1984), we have never addressed the question as a matter of state law.

**24.** The requirement that copies of any transcripts of testimony be filed is closely analogous to the requirement in Utah Code Ann. § 77–11–9(5) that grand jury testimony be preserved. It will also facilitate review of the state's attorneys' compliance with the notice-to-witnesses requirements articulated elsewhere in this opinion.

the state's attorneys with even minimal guidance and, therefore, the provisions are so vague that they deny due process.

█ We agree with respondents that the statutory language could be more precise. Nevertheless, nothing in the statute warrants the broad construction that respondents have set up as a "straw man" against which to mount their attack. We find that the Act is subject to a construction sufficiently definite to weather an attack for vagueness and sufficiently narrow to prevent other due process violations, while ensuring adequate secrecy to satisfy the Act's declared purpose of "keeping information gained from investigations secret both to protect the innocent and to prevent criminal suspects from having access to information prior to prosecution." Utah Code Ann. § 77-22-1 (1982).

Section 77-22-2(3) specifically limits those things that may be kept secret to (i) the "interrogation of any witness," (ii) "such proceeding," and (iii) "the record of testimony." This section also permits the court to exclude certain persons from "any investigative hearing or proceeding." Despite respondents' concerns that this section provides for wide-ranging secrecy orders, we think that these provisions are relatively narrow and largely self-explanatory. This section permits the district court to order that any witness [25] may be interrogated in secret, that all unnecessary persons may be excluded, and that the transcript of the interrogation may be kept secret. The only uncertainty is the meaning of the provision that "such proceeding" may also be kept secret. Read in context, this certainly does not mean that the dis-

trict court can order everything about the investigation kept secret; rather, it means that the "proceeding" which constitutes the interrogation of a witness may be kept secret.[26] To fulfill the purposes of the Act, an order of secrecy regarding "such proceeding" would necessarily include a bar on revealing the very fact that a particular interrogation will occur or has occurred, the substance of the evidence obtained, and the identity of the witness. Such information has great potential for damaging the reputations of innocent persons and may aid suspected criminals in hindering the investigation by intimidating witnesses or tampering with evidence. *See KUTV, Inc. v. Conder*, 635 P.2d 412, 413-14 (Utah 1981).

█ If a secrecy order is to effectively conceal information of the type described above concerning an interrogation, it may be broad enough to cover all potential sources of such information. Some of the sources that come readily to mind are documents in the hands of the court and of participants in the investigation, including state's attorneys, court reporters, court personnel, investigating agency staff, and other persons who have access to investigation documents or are present in interrogations. Those persons may be ordered not to reveal information about the investigation other than to participants whose knowledge is directly necessary for the conduct of the investigation. *Cf.* Fed.R. Crim.P. 6(e)(2) (secrecy of grand jury proceedings). However, to avoid an interpretation of the Act that might raise constitutional questions, we construe the secrecy

---

**25.** We assume that the Act was intended to cover not only the interrogation of witnesses giving oral testimony, but also the interrogation of those subpoenaed primarily for the purpose of obtaining documents or other items of real evidence in their control. Therefore, the secrecy provisions would apply equally to the fruits of either type of interrogation.

**26.** Our interpretation of the scope of secrecy intended by the Act is supported by a comparison of the language of the 1971 and the 1980 versions of the statute. The 1971 Act provided that upon a state's attorney's application, the court could order that the "interrogation of any witness shall be before a closed court; [and]

that such proceeding be secret." Utah Code Ann. § 77-45-20 (1971). In 1980, the words "held in secret" were substituted for "before a closed court." In the 1971 Act, the words "such proceeding" obviously related to the antecedent "interrogation of any witness ... before a closed court." Although the current version of the Subpoena Powers Act clearly no longer requires that the district court directly oversee the specific interrogation which is to be conducted in secret, there is no indication that such a change also expands the scope of secrecy by cutting the words "such proceeding" loose from their former mooring.

provisions as not preventing those subpoenaed from revealing facts concerning their own involvement in the investigation, including the fact that they have testified and the substance of that testimony. *Cf. id.* In Subpoena Powers Act investigations, as in the federal grand jury context, imposing gag orders on witnesses "seems an unnecessary hardship and may lead to injustice." *Id.* advisory committee's note.

■ A further question remains. Once a secrecy order issues, does it apply to any and all interrogations, or does it apply only to particularly identified interrogations? We certainly think that the Act contemplates that the district court is empowered to cloak every interrogation with a secrecy order when adequate reasons for doing so exist. Yet we also think that the lack of historical precedent for allowing secret, non-grand jury inquisitions justifies a narrow interpretation of the Act, requiring that the state's attorney apply for and that the court issue a secrecy order with respect to each individual interrogation. And we further conclude that the state must make a showing justifying such a secrecy order with respect to each interrogation for which secrecy is sought. Such a showing could be made only by demonstrating a reasonable likelihood that publicly releasing information about the identity of a witness or the substance of the evidence resulting from a subpoena or interrogation would pose a threat of harm to someone or otherwise impede the investigation. This requirement assures that the secrecy provisions may be used to serve their underlying purposes, but may not be used to indiscriminately conceal criminal investigations from public view.

■ We next note what may not be kept secret under the Act. The legislature tailored the secrecy provisions to protect only the interrogation or evidence-gathering proceedings; it clearly did not intend them to cover the application for the order authorizing the investigation or the state's good cause showing. It is certainly possible that such a showing could be specific

enough to guard against pretextual use of the Act by prosecutors and to permit meaningful supervision of the use of its subpoenas by the district court without identifying specific witnesses or targets. Therefore, the legislature may have concluded that permitting public access to the good cause showing would not necessarily raise the specter of harming the innocent or permitting criminal suspects to obstruct the investigation. Therefore, we conclude that the legislature's omission of the showing in its list of information that may be made secret was intentional and that the application, good cause affidavit, and authorization order may not be kept secret.

We now address respondents' claim that the Act's secrecy provisions and lack of record-keeping provisions will prevent a subpoenaed person from learning enough about an investigation to protect his or her fourth amendment rights effectively.[27] It is certainly true that a subpoenaed person must have a meaningful opportunity to challenge the lawfulness of a subpoena. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415, 104 S.Ct. 769, 773, 78 L.Ed.2d 567 (1984). But in light of the construction we have given the Act's secrecy provisions and record-keeping requirements, we find this claim to be without merit. The order authorizing the investigation and any order modifying that original order will be matters of public record, along with the supporting good cause statement. These should provide adequate information about the nature and scope of the investigation for a subpoenaed person to judge intelligently whether the subpoena may be subject to challenge. In the absence of a showing that public access to these documents will not permit adequate defense of fourth amendment rights, we find respondents' claim entirely speculative.

■ Respondents further challenge the Act's secrecy provisions on the ground that they will encourage the state's attorneys to forum-shop, in violation of the Utah due process clause. Utah Const. art. I, § 7. The gist of this argument is that because

---

27. Respondents do not claim a denial of rights under the Utah constitutional provisions barring unreasonable searches and seizures. *See* note 7, *supra.*

the Act may permit judicial orders concerning an investigation to be kept secret from the public and other courts, a state's attorney whose investigation has been limited in scope by one court's order will be encouraged to commence another investigation before another district court that may be more favorably disposed toward the state's position. Because each court will be unaware that the other has authorized an investigation, the state's attorney can pick and choose among the judges' rulings on similar points.

Our construction of the Act's provisions largely eliminates such fancied infirmities. Nothing in the Act prevents the second court from being made aware of the existence of the first investigation. The initial application and authorizing order may not be kept secret. And any subpoenaed person is free to inform the second court of any information known to that person regarding the first investigation. We therefore conclude that the Act creates no greater risk of forum-shopping than is already present with other investigative methods. Respondents' state constitutional due process challenge is without merit.

3. Equal Protection

■ Respondents next contend that the Subpoena Powers Act violates the equal protection principles we have found to inhere in the uniform operation of the laws provision of our state constitution, art. I, § 24,[28] by creating a system for investigating criminal activities which is separate from and unequal to the state grand jury system. Respondents make two claims. First, they assert that persons investigated under the Act are treated less favorably in that they are given fewer procedural protections than those investigated under the grand jury statutes, sections 77–11–1 to –11 of the Code. Second, they argue that allowing investigators to choose freely between the two investigative systems encourages arbitrariness offensive to constitutional principles. We reject both arguments.

First, it is true that some procedural distinctions exist between the two investigative systems. Our construction of the Subpoena Powers Act eliminates the constitutionally significant distinctions by requiring target warnings and notice of the privilege against self-incrimination.[29] We conclude that so long as persons investigated or subpoenaed under authority of either statutory scheme are accorded due process, the differences between the two systems are not enough, standing alone, to rise to the level of a violation of article I, section 24. *See State v. Sisneros,* 137 Ariz. 323, 670 P.2d 721 (1983) (coexistence of two methods for initiating a felony prosecution does not violate equal protection clause of state constitution); *State v. Clark,* 291 Or. 231, 630 P.2d 810 (availability of dual systems for initiating prosecutions does not violate state or federal equal protection constitutional provisions), *cert. denied,* 454

**28.** Respondents cite article I, section 2 of the Utah Constitution to support their equal protection claim. This Court has noted, however, that while article I, section 2 uses the term "equal protection," "it is more a statement of a purpose of government than a legal standard that can be used to measure the legality of governmental action." *Malan v. Lewis,* 693 P.2d 661, 669 n. 13 (Utah 1984). Article I, section 24 provides, "All laws of a general nature shall have uniform operation." In application, this section is considered the state equivalent of the equal protection clause of the fourteenth amendment to the United States Constitution. *Malan,* 693 P.2d at 669, n. 13 (citing *Liedtke v. Schettler,* 649 P.2d 80, 81 n. 1 (Utah 1982)). Because the substance of respondents' equal protection claim remains unchanged regardless of its constitutional source, we analyze this argument under article I, section 24.

**29.** The remaining procedural distinctions involve differences in the presence of a citizen panel and the right to a preliminary hearing. On balance, we find it difficult to say which investigative process is more advantageous to a subpoenaed person. For example, in grand jury proceedings, the coercive atmosphere of the interrogation is arguably lessened by the presence of the citizen panel. However, it has been observed that such citizen panels may be little more than rubber stamps for the prosecution. *See, e.g., Hawkins v. Superior Court,* 22 Cal.3d 584, 589, 586 P.2d 916, 919, 150 Cal.Rptr. 435, 438 (1978) and authorities cited therein. Also, if persons investigated under the Act are eventually charged, they are accorded a pretrial preliminary hearing with all of its protections, but persons indicted by a grand jury proceed directly to trial. *Cf. id.* 22 Cal.3d at 592, 586 P.2d at 921, 150 Cal.Rptr. at 440.

U.S. 1084, 102 S.Ct. 640, 70 L.Ed.2d 619 (1981); *accord United States v. Simon,* 510 F.Supp. 232 (E.D.Pa.1981) (denial of a preliminary hearing following a grand jury indictment does not violate federal due process or equal protection). *But cf. Hawkins v. Superior Court,* 22 Cal.3d 584, 586 P.2d 916, 150 Cal.Rptr. 435 (1978) (denial of a preliminary hearing following grand jury indictment violates state equal protection clause).[30]

■ This does not resolve respondents' second claim, which is that even if the two investigation systems may constitutionally coexist, the state's attorney responsible for choosing which system to use for any particular inquiry must act within constitutional constraints. Respondents suggest that if a state prosecutor's discretion is entirely unfettered, his or her decisions about whom to investigate and which statutory scheme to use may be so arbitrary as to violate equal protection principles contained in the uniform operation of the laws provision. Utah Const. art. I, § 24.

We agree that the uniform operation clause does impose some constraints on a state's attorney's exercise of discretion. *See United States v. Batchelder,* 442 U.S. 114, 125 n. 9, 99 S.Ct. 2198, 2205 n. 9, 60 L.Ed.2d 755 (1979); *cf. State v. Bishop,* 717 P.2d 261, 265–66 (Utah 1986) (applying state and federal equal protection principles to sentencing provisions). However, in the absence of some showing that the prosecutor is classifying persons improperly, the mere existence of the discretionary power to select which mechanism to use

does not offend the uniform operation of the laws provision of article I, section 24. *See United States v. Simon,* 510 F.Supp. 232, 235 (E.D.Pa.1981) (prosecutorial discretion to charge by information or indictment does not violate federal equal protection provision).

We have considered respondents' other claims and find them to be without merit. We reverse the district court's ruling that the Subpoena Powers Act is facially unconstitutional. As we have interpreted it and with the procedural protections we have imposed, we find that the Act survives constitutional scrutiny.[31]

### B. *Validity as Applied*

As the attorney general concedes, the Subpoena Powers Act was improperly applied during the Emery County investigation into the "theft" of UP & L's "assets." We find that the Act was improperly applied in at least three respects.

■ First, each subpoena included a statement that it was "authorized by order of the District Court" and that "[d]isobedience to this order is punishable by contempt of Court." These representations should not have been made. They misstated the law and might have improperly discouraged the recipients from challenging the subpoenas. The first representation may have led respondents to believe, quite justifiably, that the court had previously reviewed individual subpoenas for reasonableness and that it would be futile to attempt to challenge a subpoena. Under the Act, the district court had not reviewed

---

**30.** In *Hawkins,* the California Supreme Court held that a defendant charged by indictment is seriously disadvantaged in contrast to a defendant charged by information. Using a state equal protection analysis, the court found that the state could offer no compelling interest for denying the fundamental rights inherent in a preliminary hearing to some while granting those rights to others. Thus, the court concluded that equal protection mandates that those indicted by a grand jury receive a post-indictment preliminary hearing. 22 Cal.3d at 592–95, 586 P.2d at 921–22, 150 Cal.Rptr. at 440–41. We think that the *Hawkins* court's analysis actually merges the concepts of due process and equal protection and that the court ultimately imposed the requirement of a post-indictment pre-

liminary hearing to satisfy its conception of due process.

**31.** This is not to suggest that our finding of facial constitutionality will survive abuse of the Act's powers. Both our analysis and our conclusion may change dramatically if future cases show that the powers are subject to practical abuse despite the procedural and substantive safeguards we have implied into the Act. And as our holding that the trial court properly terminated the UP & L investigation demonstrates, the courts must closely monitor any actual application of the Act's provisions to determine whether the state's attorneys have overstepped their bounds.

and authorized individual subpoenas; rather, it had authorized the overall investigation.

The second representation implied that each subpoena had the authority of a court "order" and that "disobedience" of the subpoena could be summarily punished as contempt. In reality, the individual subpoenas were not court orders, and refusal to comply with a subpoena could not be punished as contempt until several procedural steps had been followed. First, as discussed at the beginning of this opinion, subpoenaed persons may challenge a subpoena by means of a motion to quash. Second, under our general contempt law, no finding of contempt could issue until, *inter alia*, the state's attorney had informed the court of the failure to comply and the court had conducted a hearing and made written findings that the witness had wilfully refused to comply.[32] To the extent that these misrepresentations discouraged respondents or other subpoenaed parties from exercising their right to challenge the subpoenas, they denied rights guaranteed by the Act and by the fourth amendment. U.S. Const. amend. IV.

◼ The second aspect of the Act's improper usage is the failure of the state's attorneys to notify every respondent, prior to interrogation or production of evidence, of the general nature and scope of the investigation and of the right to exercise the privilege against self-incrimination. These failures violated respondents' state and federal constitutional privileges against self-incrimination.[33] Utah Const. art. I, § 12; U.S. Const. amend. V.

◼ Finally, we find that the secrecy provisions of the Act were applied too broadly. The district court's secrecy order was so expansive that it covered the good cause affidavit submitted in support of the initial application for authorization of the investigation. As stated previously in this opinion, the secrecy provisions of the Act were not intended to cover the initial application for authorization or the supporting good cause statement. Moreover, to the extent that the concealment of the good cause statement impeded the challenge of subpoenas or interrogations, it operated to deny rights against unreasonable search and seizure. U.S. Const. amend. IV.

For these reasons, we conclude that the district court acted within the proper scope of its discretion to control the investigation and prevent abuse of the courts' subpoena powers when it terminated the UP & L investigation.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, Associate Chief Justice: (dissenting).

I dissent. I believe the Subpoena Powers Act (the "Act") is unconstitutional on its face. The United States Supreme Court has observed, in language which I believe is applicable to this Act, "A general, roving, offensive, inquisitorial, compulsory investigation, conducted by a commission

---

**32.** *See, e.g.,* Utah Code Ann. §§ 78–32–1 to –16 (1987); *Thomas v. Thomas,* 569 P.2d 1119 (Utah 1977); *cf.* Utah R.Civ.P. 37 (contempt for failure to cooperate in discovery). We do not intend this general overview to be an exclusive list of the substantive and procedural rules required for a finding of contempt for failure to comply with a subpoena issued under the Act. Nor do we imply that failure to comply with a subpoena issued under the Act without precompliance judicial review will necessarily be governed by the same standards as failure to comply with a subpoena which has been previously reviewed by a court.

We note also that in section 77–22–3 of the Act, the legislature has outlined certain procedures to be followed in determining whether failure to comply with a subpoena is contempt.

The language defining the circumstances under which those procedures are required is ambiguous. Under one interpretation, the heightened procedural protections would apply only to witnesses who have been granted immunity; under another, they would apply to all persons subpoenaed under the Act. We need not reach that issue of statutory construction in this case because we hold that the representations on the face of the subpoenas misstated even the basic procedural requirements of our general law of contempt.

**33.** The attorney general has represented to this Court that none of the respondents were investigation targets; therefore, there was no failure to give the target warnings required by article 1, section 12 of the Utah Constitution.

without any allegations, upon no fixed principles, and governed by no rules of law, or of evidence, and no restrictions except its own will, or caprice, is unknown to our constitution and laws; and such an inquisition would be destructive to the rights of the citizen, and an intolerable tyranny." *Jones v. S.E.C.*, 298 U.S. 1, 27, 56 S.Ct. 654, 662, 80 L.Ed. 1015 (1935) (quoting *In re Pacific Ry. Comm'n*, 32 F. 241 (C.C.Cal. 1887)). This language applies in essential respects to the powers the Legislature has sought to confer on county prosecutors and the Attorney General. The Subpoena Powers Act vastly extends the compulsory inquisitorial power of state and county prosecutors over both citizens and government officials. Anglo–American history is fraught with examples of abuses of similar powers by government officials.

The majority opinion fails to address the central flaw in the Act. It simply rewrites the Act and even then does not remedy the infirmities. In rewriting the Act, the Court embarks upon the extraordinary course of reading into the Act a host of new provisions which were not put there by the Legislature and which render the statute a different creature than that enacted by the Legislature. I submit that the Court goes far beyond legitimate judicial power in doing so. The Court's task is to declare whether the Act is constitutional as it was written, subject to reasonable construction of its actual terms,[1] rather than "implying" a host of new terms into it.

The new provisions superimposed by the majority upon the statute in its attempt to uphold the statute are numerous and extensive. So-called *Miranda*-type warnings imposed by the majority are nowhere mentioned in the Act itself and, in fact, are not required by the policy that underlies *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because the witness is not "in custody" or in a particularly coercive atmosphere. Nor is the warning required by the Court much like a *Miranda* warning; the warning is in fact made up out of whole cloth. A witness is not told that he may remain quiet altogether, as *Miranda* requires; nor is the witness informed that counsel will be appointed if the witness cannot afford counsel.[2] In addition, the target warnings created by the majority are not required by the Act. Likewise, the record-keeping requirements have no basis in the language of the Act. Finally, the restrictions upon secrecy orders find no basis in the language of the statute or constitutional law. In my view, *Mountain States Telephone & Telegraph Co. v. Public Service Comm'n*, 107 Utah 502, 505, 155 P.2d 184, 185 (1945), which held that "the court has no power to rewrite a statute to make it conform to an intention not expressed," should govern here. *See also Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 690, 88 S.Ct. 1298, 1306, 20 L.Ed.2d 225 (1968); *United States v. Monia*, 317 U.S. 424, 430, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943).

---

**1.** I believe the majority's view of the pertinent standard of review is patently erroneous. A determination that a statute has a reasonable basis cannot resolve its constitutionality when the statute trenches on fundamental personal liberties. Furthermore, it is extraordinary for the Court to assert that it "must supply omitted procedural elements that are necessary to implement legislation consistent with constitutional requirements." The cases cited by the majority do not support that. Of course, we *construe* statutes to be constitutional, when that is possible. But I know of no case where this Court, or any other court, has added a virtual code of procedure to a statute, as this Court does.

**2.** The Court in effect decides *sub silento* one significant issue with respect to the privilege. The Court allows the privilege against self-incrimination to be interposed to particular questions. But this Court has never decided wheth-

er the Utah privilege against self-incrimination would permit a putative defendant to refuse to testify at all in a procedure such as this. The United States Supreme Court has held that the Fifth Amendment privilege does not permit a putative defendant to refuse to testify altogether in a grand jury proceeding. *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed. 2d 212 (1976). The issue is an important one that should be fully briefed and appropriately decided. Furthermore, I note that the Supreme Court has held that *Miranda* warnings need not be given in grand jury proceedings, even to target defendants. That Court has also held that no warning must be given of one's Fifth Amendment privilege against self-incrimination in a grand jury proceeding. *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977).

More significantly, I believe that the Act as initially written and as construed by the Court is unconstitutional because prosecutorial inquisition by compulsory process without judicial approval *prior to issuance of the process* violates the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment of the Federal Constitution and Article I, sections 7 and 14 of the Utah Constitution and circumvents the protections provided by a grand jury.

Section 77–22–2 of the Subpoena Powers Act provides:

(1) In any matter involving the investigation of a crime, the existence of a crime or malfeasance in office or any criminal conspiracy or activity, the attorney general or any county attorney shall have the right, upon application and approval of the district court, for good cause shown, to conduct an investigation in which the prosecutor may subpoena witnesses, compel their attendance and testimony under oath before any certified court reporter, and require the production of books, papers, documents, recordings and any other items which constitute evidence or may be relevant to the investigation in the judgment of the attorney general or county attorney.

(2) The subpoena need not disclose the names of possible defendants and need only contain notification that the testimony of the witness is sought in aid of criminal investigation and state the time and place of the examination, which may be conducted anywhere within the jurisdiction of the prosecutor issuing the subpoena, and inform the party served that he is entitled to be represented by counsel. Witness fees and expenses shall be paid as in a civil action.

(3) The attorney general or any county attorney may make written application to any district court and the court may order that interrogation of any witness shall be held in secret; that such proceeding be secret; and that the record of testimony be kept secret unless and until the court for good cause otherwise orders. The court may order excluded from any investigative hearing or proceeding any persons except the attorneys representing the state and members of their staffs, the court reporter and the attorney for the witness.

An investigation under the Act involves two steps. First, a prosecutor must file a "good cause" statement with the district court. That statement needs only to allege that there is good cause to engage in an investigation of "a crime," "malfeasance in office," or any "criminal ... activity." The prosecutor need not even allege that a particular crime has been committed. Nor need he prove, by affidavits or otherwise, even an articulable basis for believing that anyone has committed a crime, malfeasance, or criminal conduct. Nor do any names of putative defendants need to be alleged. And the court need not make any findings.

Second, on that flimsy basis, subpoenas *duces tecum* and *ad testificandum* may issue from the clerk of the court on the simple request of the prosecutor. The actual issuance of the subpoena depends solely on the good faith of the prosecutor that the evidence sought, whether testimonial or documentary, is relevant to the good cause statement *"in the judgment"* of the prosecuting attorney.

The subpoena may order a person to produce documents or to testify, or both, either in secret or in public, essentially *as the prosecutor chooses.* A prosecutor need not show that there is probable cause or an articulable suspicion, see *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or any other legal cause to detain and compel a witness to testify or to produce private papers and physical evidence.

Once a subpoena is served, a person subject to it may move to quash. But that is not protection under the Act. There is, in fact, little that a trial judge can do to prevent abuse on a motion to quash since the prosecutor need only show relevancy to the investigation based on the "good cause" statement, and that is virtually no protection, especially when a prosecutor alleges "good cause" on the basis of "criminal activity," a term of extraordinary elas-

ticity. That term is so broad as to virtually nullify whatever protection the relevancy limitation may offer. Furthermore, many witnesses will undoubtedly not be represented by counsel, and those who are not will not likely find their way to a trial judge to seek relief from prosecutorial overreaching. *Cf. Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 219, 66 S.Ct. 494, 510–11, 90 L.Ed. 614 (1946) (Murphy, J., dissenting). Even those who do have counsel will find it difficult to demonstrate abuse either in the detention itself because of the extraordinarily vague standards established by the Act or in the conduct of an interrogation.

The majority asserts that the protections granted to a witness under the Act are no less than those afforded by a grand jury and that the powers given to prosecutors are no greater than those given to a grand jury. It is true that a prosecutor has all the power of a grand jury, but he has it without any of the restraint that comes from the grand jurors. The members of a grand jury should bring to bear the conscience of the community in restraining the conduct of an overzealous prosecutor with respect to all witnesses. In effect, the grand jury system substitutes the grand jurors for the protections of the Fourth Amendment.

Thus, a prosecutor elected by one political party can use the powers conferred by the Act to rummage through the affairs of political enemies to harass and embarrass them on the flimsiest of pretexts. All kinds of private matters of individual citizens can be explored and exposed. Children can be interrogated under oath about activities of their parents, and parents interrogated under oath about the activities of their children. Husbands and wives can be interrogated about the activities of each other, neighbors interrogated about neighbors, and reporters and editors interrogated about activities and conversations with news sources. *Cf. Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

In truth, the power of the prosecutor to intrude upon the right to be left alone, the right "most valued by civilized man," *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), is formidable and fearsome. And it is made all the more so by the prosecutor's freedom to decide which interrogations may be made public, a power that does not exist with respect to grand jury proceedings. The destruction of reputation, employment, and family life by forced public exposure of private matters that took place in the infamous McCarthy era on a vast scale ought not to be forgotten. Overly zealous people who act in the name of some "higher" principle and run roughshod over the rights of others are to be found in every generation. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well meaning, but without understanding." *Id.* at 479.

The majority fails to recognize that it deals with grand jury powers without the restraining effect of grand jurors. The grand jury is a constitutional body, expressly established in the Utah Constitution by Article I, section 13 and in the Federal Constitution by the Fifth Amendment. To the grand jury is committed power to employ compulsory process to investigate criminal conduct. Grand jurors can provide a significant restraint on prosecutorial abuse. They come together for one purpose. They have no concern with being reelected or complying with the wishes of a supervisor. The United States Supreme Court has stated: "The most important function of the grand jury is not only to examine into the commission of crimes ... but 'to stand between the prosecution and the accused.'" *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). Justice Marshall described the role and function of the grand jury in *United States v. Dionisio,* 410 U.S. 1, 45–46, 93 S.Ct. 764, 788, 35 L.Ed.2d 67 (1973) (Marshall, J., dissenting):

Certainly the most celebrated function of the grand jury is to stand between the government and the citizen and thus to protect the latter from harassment and unfounded prosecution. See *e.g., Wood v. Georgia,* 370 U.S. 375, 390, [82 S.Ct. 1364, 1373, 8 L.Ed.2d 569] (1962); *Hoff-*

*man v. United States,* 341 U.S. 479, 485, [71 S.Ct. 814, 817, 95 L.Ed. 1118] (1951); *Ex parte Bain,* 121 U.S. 1, 11 [7 S.Ct. 781, 786–87, 30 L.Ed. 849] (1887). The grand jury does not shed those characteristics that give it insulating qualities when it acts in its investigative capacity. Properly functioning, the grand jury is to be the servant of neither the Government nor the courts, but of the people. *Hale v. Henkel,* 201 U.S., [43] at 61 [26 S.Ct. 370, 373, 50 L.Ed. 652]. As such, we assume that it comes to its task without bias or self-interest. Unlike the prosecutor or policeman, it has no election to win or executive appointment to keep. The anticipated neutrality of the grand jury, even when acting in its investigative capacity, may perhaps be relied upon to prevent unwarranted interference with the lives of private citizens and to ensure that the grand jury's subpoena powers over the person are exercised in only a reasonable fashion. Under such circumstances, it may be justifiable to give the grand jury broad personal subpoena powers that are outside the purview of the Fourth Amendment, for—in contrast to the police—it is not likely that it will abuse those powers. Cf. *Costello v. United States,* 350 U.S. 359, 362 [76 S.Ct. 406, 408, 100 L.Ed. 397] (1956); *Stirone v. United States,* 361 U.S. 212, 218 [80 S.Ct. 270, 273–74, 4 L.Ed.2d 252] (1960).

Whatever the present day validity of the historical assumption of neutrality that underlies the grand jury process, it must at least be recognized that if a grand jury is deprived of the independence essential to the assumption of neutrality—if it effectively surrenders that independence to a prosecutor—the dangers of excessive and unreasonable official interference with personal liberty are exactly those that the Fourth Amendment was intended to prevent.

Even if it is conceded, as some argue, that grand juries have too often been mere instrumentalities of prosecutors and have not adequately served to prevent abuse, that does not justify imposing still fewer restraints on prosecutors by entirely removing the grand jury as a buffer against abuse. Yet, that is precisely what the Subpoena Powers Act does and the majority condones.

The fear of prosecutorial use of subpoenas to question citizens about criminal violations of law outside the control of a grand jury has led courts to hold such interrogations unlawful. In *United States v. O'Connor,* 118 F.Supp. 248, 250–51 (D.Mass.1953), the court held that a government law enforcement agent could not circumvent the grand jury by using a subpoena to compel a person to testify concerning a possible criminal violation. The court stated, "The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure." *Id.* That same principle has been applied by a number of other courts. *See In re Melvin,* 546 F.2d 1 (1st Cir.1976), *cert. denied,* 430 U.S. 913, 97 S.Ct. 1323, 51 L.Ed.2d 591 (1979); *Durbin v. United States,* 221 F.2d 520 (D.C.Cir. 1954); *In re Grand Jury Proceedings/Subpoenas,* 593 F.Supp. 92 (S.D.Fla. 1984); *see also United States v. Miller,* 500 F.2d 751 (5th Cir.), *reh'g denied,* 508 F.2d 588, *rev'd on other grounds,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); 8 *Moore's Federal Practice* ¶ 17.06 (1975).

The United States Court of Appeals for the D.C. Circuit has enunciated a similar principle that also applies here. The court stated that the constitution, statutes, and traditions "do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office." *Durbin,* 221 F.2d at 522; *see In re Melvin,* 546 F.2d at 5. Indeed, it is widely established that prosecutors cannot use subpoenas, whether a grand jury subpoena without grand jury authorization or some other type of subpoena authorized by law, solely to investigate criminal activities. *E.g., In re Melvin,* 546 F.2d 1; *United States v. Keen,* 509 F.2d

1273 (6th Cir.1975); *Durbin,* 21 F.2d 520; *United States v. O'Kane,* 439 F.Supp. 211 (S.D.Fla.1977); *O'Connor,* 118 F.Supp. 248; *see also United States v. Smith,* 687 F.2d 147 (6th Cir.1982), *cert. denied,* 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983); *United States v. Santucci,* 674 F.2d 624 (7th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983); *In re Grand Jury Proceedings/Subpoenas,* 593 F.Supp. at 95.

The majority places great weight on *pre-compliance* supervision of subpoenas by motions to quash but does not require *preissuance* judicial authorization of each subpoena issued as a means of assuring some protection under the Fourth Amendment and Article I, section 14. Precompliance supervision of subpoenas has always been available on a motion to quash, even of grand jury subpoenas, but it is not a sufficient protection when prosecutors conduct criminal investigations by compulsory process, independent of the grand jury.

Even if the Legislature could circumvent the constitutional function of the grand jury, the statute would also violate the Fourth Amendment, Article I, section 14, and due process under both constitutions. As construed by the majority, the Act requires a citizen to take affirmative action to prevent the state from intruding on his or her liberty. Except for grand jury subpoenas, *see United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, the general rule is that until a criminal charge is formally made, the state bears the burden of first establishing that its intrusion upon a citizen's liberty is lawful. *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The point is not trivial. There is a great difference between allowing the government to curtail personal liberty until a citizen obtains a court order commanding the government to cease and requiring the government to first justify its intrusion on personal liberty before it actually does so. *See State v. Grijalva,* 111 Ariz. 476, 533 P.2d 533 (1975) (requiring an initial court order). The point deals with a fundamental aspect of the relationship of citizens to the government. The majority's position turns that fundamental proposition on its head.

Many persons, given the air of authority which a subpoena carries by virtue of a court seal and its formal and official service, will assume that the subpoena is legally authorized and will comply with it, no matter how invasive it is.[3] *Cf. Walling,* 327 U.S. at 219, 66 S.Ct. at 510–11 (Murphy, J., dissenting). Some will not be able to afford an attorney and will comply with the order to appear, even though they could lawfully refuse. All such persons risk waiving their rights against unreasonable searches and their rights not to give testimonial or documentary evidence that may tend to incriminate them. These persons, and even persons represented by counsel, may be misled as to the scope of the interrogation and inadvertently waive their constitutional rights because no putative defendant is named in the good cause statement and because the good cause statement may be too vague. All these difficulties are accentuated by the ambiguous standards established by the Act for commencing an investigation. Indeed, the majority candidly observes that the loose standards in the Act might "tempt the state to poke 'about in the speculation of finding something chargeable.' 8 Wigmore, *Evidence* § 2250, at 271 (McNaughton rev. 1961)."

I recognize that every citizen has a duty to provide testimony in criminal proceedings when called upon by a court to do so for a judicial proceeding or when called upon by a grand jury to do so. But I know of no rule requiring citizens to appear before *prosecutors* to testify or give documentary evidence.

**3.** In holding that the Act was unlawfully applied, the Court states that the subpoenas issued misstated the law. The Court is in error. A subpoena is a court order to appear and testify or produce physical evidence, and disobedience is punishable as contempt. 81 Am.Jur.2d, *Witnesses* § 9 (1976). *See generally* Utah Code Ann. § 77–35–14 (1982). Of course a hearing must first be held before one may be held in contempt. However, failing to tell a subpoenaed person that disobedience is punishable as contempt would deprive a person of notice of the possible consequences of disobedience.

The majority relies on *Donovan v. Lone Steer, Inc.,* 464 U.S. 408, 104 S.Ct. 769, 78 L.Ed.2d 567 (1984), for the proposition that precompliance judicial review of the lawfulness of a subpoena, rather than preissuance judicial review, is sufficient. That reliance is misplaced. *Lone Steer* involved enforcement of a civil subpoena, not a subpoena issued in a criminal investigation. The difference between civil and criminal investigations lies at the very foundation of much of our procedural law, in part because of the Fourth Amendment. The United States Supreme Court has relied upon the distinction invariably in cases involving subpoenas issued by administrative agencies and special commissions and challenged on Fourth and Fifth Amendment grounds.

The flexible standards applicable to administrative subpoenas should not apply to subpoenas issued by a state's prosecuting attorney in the context of a criminal investigation. To apply those standards would result in weakening personal liberties protected by the Bill of Rights. The point is illustrated in *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), which upheld a flexible probable cause standard for entry and search of commercial premises by an administrative agency, based on area inspection standards, even though the Court has consistently recognized that the Fourth Amendment requires that law enforcement officials must have a warrant backed by probable cause to conduct a search in a criminal investigation. *See New York v. Class,* 475 U.S. 106, 117, 106 S.Ct. 960, 967–68, 89 L.Ed.2d 81 (1986); *United States v. Karo,* 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3302–03, 82 L.Ed.2d 530 (1984); *United States v. Ventresca,* 380 U.S. 102, 105–106, 85 S.Ct. 741, 744–45, 13 L.Ed.2d 684 (1965).

Furthermore, the Supreme Court has specifically recognized that the government's deliberate use of administrative subpoenas to gather evidence in a criminal case impermissibly disregards the "safeguards and restrictions of the Constitution and laws of the United States." *Abel v. United States,* 362 U.S. 217, 226, 80 S.Ct. 683, 690, 4 L.Ed.2d 668 (1960). In other words, the Court has impliedly determined that the safeguards appropriate in civil administrative procedures are inadequate to protect the constitutional rights of individuals in criminal law proceedings. Consequently, the standards governing administrative subpoenas do not apply to subpoenas issued under the Act in question. Nor do those standards undermine the conclusion that the Subpoena Powers Act violates the Fourth Amendment because subpoenas are issued without prior judicial authorization. *See, e.g., Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *State v. Grijalva,* 111 Ariz. 476, 533 P.2d 533, *cert. denied,* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975) (holding that a suspect may be detained temporarily to give evidence after a court has entered an order authorizing the detention, although on a lesser showing than probable cause).

In addition to the distinction between administrative and criminal procedures suggested by *See v. Seattle,* the Supreme Court has recognized a distinction between the investigatory and accusatory functions sufficient to warrant different procedural standards within the context of administrative procedure. *See Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). In *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), the Court clarified the distinction between the investigative and accusatory functions of administrative agencies. *Jenkins* involved a challenge to the constitutionality of a Louisiana statute authorizing a labor-management commission, upon referral from the governor, to investigate alleged criminal violations in the field of labor-management relations. The commission was given authority to hold public hearings to determine whether probable cause existed to believe that criminal violations had occurred, to make public findings, and to recommend to appropriate authorities that criminal prosecutions be commenced. *Id.* at 414–17, 89 S.Ct. at 1845–47. Observing that "everything in the Act points to the fact that it is concerned only with exposing violations of criminal laws by specific indi-

viduals," *id.* at 427, 89 S.Ct. at 1852, a plurality opinion of the Court concluded that the commission's functions were not merely investigatory but also accusatory and that greater procedural safeguards were required, including the rights of confrontation, cross-examination, and presentation of evidence. *Id.* at 428–30, 89 S.Ct. at 1852. That, of course, might apply here if a public deposition were taken.

Unlike the nonprosecutorial administrative agencies involved in *Hannah* and *Jenkins,* prosecuting attorneys are specifically authorized to prosecute subjects of a criminal investigation conducted under the Act. Utah Code Ann. § 17–18–1(1) (1987) (county attorneys); Utah Code Ann. § 67–5–1(1) (1986) (attorney general). Accordingly, abbreviated administrative-type proceedings are constitutionally insufficient in the context of criminal investigations by the state's prosecutors. Dilution of citizens' rights by a strained analogy to administrative subpoenas and procedures simply ignores the fundamental safeguards that the law has always recognized in criminal procedure for the protection of individual liberties.

It is noteworthy that although the Act at issue is similar to statutes enacted in other states, it is different in one significant respect (except for Delaware's Act, Delaware, D.C.A. tit. 24 § 2508 (1974)). Other statutes require judicial approval prior to issuance of an investigative subpoena. Iowa, I.C.A. § 813.2, rule 5, subd. 6 (1979); Louisiana, La. Code Cr.Proc. art. 66 (Supp. 1984); Kansas, K.S.A. § 22–3101 (1981); Montana, M.C.A. § 46–4–301 (1987). Under these statutes, the prosecutor's authority is subject to a court's discretion to order the issuance of a subpoena. Before the prosecutor may intrude into the liberty of a citizen, he must first make some showing that the intrusion is warranted. Even then, that may not be sufficient to pass constitutional muster, in my view. Significantly, the Delaware statute does not authorize secret interrogations.

Finally, the Act allows prosecutors to engage in criminal discovery even after a formal charge has been filed, as was done in this case. Defendants have no correla-

tive right to engage in discovery. In my view, that raises serious constitutional issues under the Utah constitutional provision requiring uniform operation of the laws or equal protection of the laws. Article I, section 24.

In sum, I submit that the Act is unconstitutional on its face, as the trial court ruled, because it authorizes unreasonable searches and seizures by prosecutors, because it violates due process, and because it circumvents the institution of the Utah grand jury.